Judge CUFF
(temporarily assigned) delivered the opinion of the Court.
On October 20, 2008, police responded to a 9-1-1 call requesting assistance for an injured child. The child was defendant Terrell Hubbard’s five-month-old daughter, Lanaya. When police arrived, the infant was in an ambulance about to be transported to the hospital. Medical technicians informed the responding police officers that the child was in critical condition.
Defendant told a detective that he found his daughter lying on the bed and noticed that she was not breathing. He placed a 9-1-1 call and performed CPR while waiting for assistance. Defendant acceded to the detective’s request to come to the police *255 station to provide information that might be helpful to medical professionals treating his daughter. Defendant was in the police station for a total of three hours, which included three breaks, ranging from a few minutes to two hours in duration. After the interview was concluded, the detective drove defendant home. The detective never administered Miranda[2] warnings to defendant. Defendant’s daughter was declared dead three days later.
A grand jury returned an indictment charging defendant with second-degree manslaughter, contrary to N.J.S.A. 2C:ll-4(b)(l), and second-degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4(a). The trial court granted defendant’s motion to suppress his October 20, 2008 statement. The court concluded that defendant was in custody at the time of the interview and that police had failed to advise defendant of his Miranda rights. The Appellate Division granted the State’s motion for leave to appeal and reversed. The panel determined that this Court’s recent ruling in State v. Diaz-Bridges, 208 N.J. 544, 34 A.3d 748 (2012), permitted it to conduct a de novo review of the trial record, without deferring to the findings of fact and credibility assessments of the trial court, because it concluded that the trial court had based its findings of fact solely on the videotape of the October 20 interview. The appellate panel found that defendant had not been subject to a custodial interrogation; therefore, the failure to administer Miranda warnings to defendant at the beginning of the interview did not require suppression of the statement. We granted defendant’s motion for leave to appeal.
In Diaz-Bridges, the Court emphasized that de novo review of a video record is confined to the rare case in which the videotaped statement is the only evidence before the trial court or the trial court clearly and unequivocally relies on no evidence other than the videotaped statement to resolve the motion to suppress. Id. at 565-66, 34 A.3d 748. In this matter, we have not been asked to examine the standard of review set forth in Diaz-Bridges. There is no need to do so for in this matter the traditional rules governing appellate review of trial court findings control and *256 should have been applied by the Appellate Division. The trial court relied on evidence other than the videotaped statement, including testimony presented to it when making its findings.
We further determine that the interview conducted by the detective at the police station was a custodial interrogation and the failure to administer Miranda warnings prior to the interview requires suppression of that recorded statement.
I.
On October 20, 2008, defendant Terrell Hubbard was alone with Lanaya, his five-month-old daughter, at the home he shared in Vineland with the child’s mother and her father. The child’s mother left Lanaya in defendant’s care to go to the dentist before reporting to work. At approximately 3:30 p.m., defendant placed a 9-1-1 call to report that his daughter was not breathing. The operator instructed defendant how to administer CPR as he awaited the arrival of emergency medical assistance. Emergency medical personnel arrived at defendant’s home before the police. After restoring the child’s heartbeat, medical personnel placed her in an ambulance for transport to a hospital. Police arrived just before the ambulance departed. A medic informed Detective Jeff Travaline that the child was in critical condition.
After speaking to the medic, the detective went to the porch of the house, where defendant stood with another police officer. The detective asked defendant what had happened to the baby. Defendant stated that the child was lying on the bed and had been crying. He picked her up, realized she was not breathing, and placed the call for assistance. When a police sergeant informed Travaline that he wanted to secure the house as a crime scene, Travaline and the sergeant conducted a “walk-through” to confirm that no one else was in the house. Defendant remained on the porch with a police officer.
After locking the front door, Travaline asked defendant to accompany him to the police station. Defendant assented and Travaline drove him to the police station.
The parties disputed the circumstances surrounding defendant’s trip to the police station. Travaline maintains that he offered to *257 drive defendant because defendant’s vehicle was being used by his girlfriend. Defendant, however, insists that he had ready access to a vehicle but was given no option other than to ride in Travaline’s car. The trial court found that the detective offered defendant no option, directing him to the backseat of his unmarked police vehicle. Defendant and Travaline did not converse during the drive to the station. Defendant sat in the backseat of the vehicle.
Defendant was not handcuffed or patted down at any time that day. According to Travaline, defendant was not a suspect at that time; he was simply being interviewed to provide a fuller understanding of what transpired so that additional information could be relayed to the medical professionals treating defendant’s daughter.
At approximately 4:17 p.m., defendant entered an interview room at the station. He sat alone for almost three minutes before being joined by Travaline. After providing defendant with water, Travaline asked him to move to a different seat in the corner of the room. The move permitted defendant to face the video camera. Travaline sat across from defendant, between him and the door. Defendant was in the interview room for almost three hours. During that period, Travaline asked defendant questions for about forty minutes. Defendant was never advised of his Miranda rights that day.
Defendant told Travaline that, earlier in the day, his girlfriend informed him that the baby was cranky. Defendant tried to calm the baby over several hours. Eventually, he placed her on the bed and went to the kitchen to prepare something to eat. On his return to the bedroom, he noticed that the baby “was flimsy and ... wasn’t breathing,” so he called 9-1-1. Travaline then asked defendant to “back up a little bit” and clarify a few things. The detective’s questions focused on defendant’s movements and his interaction with his daughter. Defendant provided additional detail, explaining that Lanaya had been uncharacteristically fussy the night before and that her mother had given the child Tylenol earlier that day.
*258 At one point during the interview, Travaline left the room and returned about eight minutes later, informing defendant that the “[b]aby’s down at the hospital. They are still working on her. They do have a ... pulse. It is a weak pulse, though.”
Returning to the interview, Travaline asked defendant if Lanaya had fallen or been accidentally dropped, or if defendant may have been distracted at any point while watching her. Defendant answered each of these questions in the negative. Travaline asked defendant about his relationship with his girlfriend, whether her pregnancy was a surprise, and how the birth of the baby had altered his life. Travaline also asked if he was ever advised or counselled to treat the infant gently, whether he ever got frustrated with the baby, if he loved her, and if he ever resented her.
The exchange proceeded as follows:
[Q]: [T]here’s a reason that she, uh, there is a reason that we’re here. There is a reason that she stopped breathing. You know and ...
[A]: I know.
[Q]: ... and I don’t understand ... the time period that you[’re] giving!. It] doesn’t account or explain why she would stop breathing, I mean?
[A]: [I] never heard of anything ... like this, especially happening to my daughter.
[Q]: You ever get mad because the baby’s, you know, not mad, mad! is] the wrong word, maybe frustrated?
[A]: Yeah.
[Q]: Did you get a little frustrated at all this afternoon?
[A]: Um, no I ... I wasn’t with her long. I mean after a couple hours in the same ... same crying and whining ...
[Q]: You love this baby?
[A]: Like so much. I never had nothing like this. I got her name tattooed on my arm.
[Q]: Just seem indifferent, you know.
[A]: Just everything changed when the baby was bom. Stuff I could do before!.] I loved playing basketball. I don’t do it much. I think this summer I played about five times through the whole summer.
*259 [Q]: This wasn’t a planned event, having a baby?
[A]: No. No.
[Q]: [Y]ou ever resent the baby or ... or her, you know for [...]
[A]: [W]hat happened ...
[Q]: Uh-huh.
[A]: No. I mean, if it happened, it was meant to happen. Just how it goes. I’m not regretting anything____
At 5:12 p.m., after about an hour in the interview room, Travaline told defendant that he was going to check the baby’s status and that he would return in a few minutes. After an absence of approximately two hours, Travaline returned to the room, apologized for the wait, and told defendant he would drive him home.
Defendant’s daughter died three days later. The medical examiner’s report noted a number of healing bruises and fractures, including a broken clavicle and three broken ribs. An examination of the child’s large intestine indicated some form of impact to that organ. The medical examiner also noted abnormal swelling of the brain and fluid in the spinal cord. A neurologist opined that a bleeding malformation in the child’s brain likely caused her to become increasingly fussy and to cry. The neurologist also opined that the child sustained a traumatic injury to the brainstem and spinal cord.
The police arrested defendant on May 7, 2009, approximately seven months after the October 2008 interview. Sergeant Alexis Sheftall read defendant his Miranda rights, and Sheftall and Travaline questioned defendant. Eventually, defendant admitted that he tossed Lanaya toward the bed, causing her to hit the wall. When defendant noticed that she had stopped breathing, he called 9-1-1.
II.
The grand jury returned an indictment charging defendant with second-degree reckless manslaughter, contrary to N.J.S.A. 2C:11-4(b)(1), and second-degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4(a). In a motion to suppress the *260 recorded October 20, 2008 statement, defendant argued that the interview was a custodial interrogation and any statements made during that interview should be suppressed because the detective never advised him of his Miranda rights.
The Law Division judge conducted a suppression hearing on February 9 and 16, 2012, at which Travaline and defendant testified and the court viewed the October 20, 2008 videotaped statement. The trial court confirmed the undisputed fact that the detective did not administer Miranda warnings to defendant before or at any time during his interview. The court also found that defendant was in custody during the October 20 interview. The court stated that several factors influenced this finding, including Travaline’s instruction that defendant sit in a certain chair to permit the camera to obtain a full-face view of defendant, Travaline’s physical proximity to defendant, and the probing nature of the questions posed to defendant. In addition, the court cited several other facts presented by witnesses at the evidentiary hearing in support of its finding that defendant had been the subject of a custodial interrogation, including Travaline’s request for defendant to accompany him to the police station, placing defendant in the back seat of the unmarked police car, securing the house to prevent entry by anyone, and preparing a crime log. The court also found that no reasonable person in defendant’s position would have felt free to leave the room or the police station. An order dated March 22, 2012, suppressed the October 20 statement in its entirety.
The Appellate Division granted the State’s motion for leave to appeal and reversed the March 22, 2012 order. Quoting Dim-Bridges, supra, 208 N.J. at 566, 34 A.3d 748 the appellate panel determined that it need not defer to the factual findings of the trial court because “ ‘the trial court’s factual findings [wejre based only on its viewing of a recorded interrogation that [wa]s equally available to the appellate court and w[ere] not dependent on any testimony uniquely available to the trial court.’ ” The panel conducted a de novo review of the videotape of the October 20 *261 interview and concluded that the totality of the circumstances did not support the finding that “defendant was subject to ‘the inherent psychological pressure on a suspect in custody.’” (Quoting State v. Brown, 352 N.J.Super. 338, 351, 800 A.2d 189 (App.Div.), certif. denied, 174 N.J. 544, 810 A.2d 64 (2002)). The panel also determined that the trial court erred in attaching any significance to the fact that Travaline suspected that the child’s injuries had been inflicted by someone. The panel also dismissed the import of the detective’s request that defendant sit in a certain chair or the detective’s posture.
This Court granted defendant’s motion for leave to appeal. 217 N.J. 281, 87 A.3d 769 (2014).
III.
Defendant argues that the Appellate Division erred by limiting its review of the record to just the videotape of the October 20 interview and then conducting a de novo review of that statement. In doing so, defendant asserts that the appellate panel misapplied Diaz-Bridges, because this is not a case in which the trial court relied solely on the videotaped statement. Rather, defendant contends that the trial court plainly stated that it relied on more evidence than simply the videotaped statement. Defendant argues that the panel was required to defer to the factual findings of the trial court, which were well-supported by the entire record. Finally, defendant insists that the facts, as found by the trial court, lead to the inexorable conclusion that defendant was subject to a custodial interrogation without the benefit of Miranda warnings on October 20,2008, and that his statement must therefore be suppressed.
The State responds that “to the extent that the motion judge made any factual findings beyond the videotape, they are not proper considerations.” Therefore, the State contends that the Appellate Division was not required to defer to any findings of fact made by the trial judge and was free to limit its review to the videotape and make its own findings of fact and draw its own *262 conclusions of law. The State argues that defendant freely and voluntarily entered the police station, that defendant was not subject to restraint or an otherwise coercive environment, that he freely and voluntarily responded to all questions posed by the detective, and that defendant was never told he could not leave. Therefore, the interview had none of the hallmarks of a custodial interrogation, and the detective was not required to administer Miranda warnings to defendant.
The Attorney General, appearing as amicus curiae, submits that the Appellate Division properly adopted a de novo standard of review. The Attorney General concedes that an appellate tribunal should defer to the findings of fact of a trial court based on witness testimony, but contends that the findings of fact made by the trial court were founded solely on the videotape of the October 20 statement. Therefore, the appellate panel was not required to defer to the trial court’s findings of fact. Finally, the Attorney General submits that defendant was never in custody. Rather, the October 20 interview was nothing more than “part of an investigatory procedure” that did not require administration of Miranda warnings to defendant.
IV.
A.
Appellate courts reviewing a grant or denial of a motion to suppress must defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record. State v. Gamble, 218 N.J. 412, 424, 95 A.3d 188 (2014); State v. Elders, 192 N.J. 224, 243, 927 A.2d 1250 (2007). We defer to those findings of fact because they “are substantially influenced by [an] opportunity to hear and see the witnesses and to have the ‘feel’ of the ease, which a reviewing court cannot enjoy.” State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964). An appellate court should disregard those findings only when a trial court’s findings of fact are clearly mistaken. Id. at 162, 199 A.2d 809. In *263 those situations, the interests of justice require the reviewing court to examine the record, make findings of fact, and apply the governing law. Ibid. A trial court’s interpretation of the law, however, and the consequences that flow from established facts are not entitled to special deference. State v. Gandhi, 201 N.J. 161, 176, 989 A.2d 256 (2010). A trial court’s legal conclusions are reviewed de novo. Ibid.
The rule of deference announced in Johnson, and endorsed repeatedly through the years, see, e.g., Elders, supra, 192 N.J. at 243, 927 A.2d 1250; State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999), arose in the context of stenographically recorded proceedings. Gradually, memorialization of the record progressed from the stenographer to audio recordings to video recordings. Following a comprehensive study of “whether and how to implement the benefits of recording electronically part, or all, of custodial interrogations,” State v. Cook, 179 N.J. 533, 561, 847 A.2d 530 (2004), the Court adopted Rule 3:17 in 2005, which generally requires electronic recordation of custodial interrogations of those charged with certain enumerated serious offenses. Rule 3:17(a) outlines a series of circumstances in which the electronic recordation requirement applies when the person being interrogated is charged with murder, aggravated manslaughter, or manslaughter. Rule 3:17(b) outlines circumstances when the electronic recordation requirement does not apply. For example, subsection (b)(vii) does not require electronic recordation of a statement given during an interrogation when the law enforcement officer conducting the interrogation has no knowledge that a crime for which a recording is required has been committed. The State bears the burden of proof by a preponderance of the evidence to establish that an exception to the recordation requirement applied. R. 3:17(b).
Although the means of recording statements or proceedings have changed, the deference accorded to the findings of fact of the trial judge has not. See Elders, supra, 192 N.J. at 243-44, 927 A.2d 1250 (reiterating need to defer to factual findings derived *264 from record consisting of testimony of officers and videotape record of motor vehicle stop). That deference is not limited to credibility findings by the trial court. Indeed, in the course of rejecting the notion that appellate deference to factual findings should be limited to credibility findings, the United States Supreme Court commented that “[duplication of the trial judge’s efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, ... requiring [the parties] to persuade three more judges at the appellate level is requiring too much.” Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 529 (1985).
Nevertheless, the introduction of electronic recordation of court proceedings and certain investigative proceedings, such as custodial interrogations, has triggered questions about whether the traditional standard of appellate review should be maintained. In Diaz-Bridges, supra, the Court indicated that when assessing the totality of the circumstances in certain fact-sensitive contexts, such as an assessment of whether a defendant invoked his right to remain silent or to terminate an interrogation or to request counsel, appellate review may require consultation of the videotaped statement. 208 N.J. at 565, 34 A.3d 748. The Court remarked as follows:
As it relates to the invocation of the right to remain silent, both the words used and the suspect’s actions or behaviors foi’m part of the inquiry into whether the investigating officer should have reasonably believed that the right was being asserted. As a result, the court’s inquiry necessarily demands a fact-sensitive analysis to discern from the totality of the circumstances whether the officer could have reasonably concluded that the right had been invoked. For this reason, it may be inadequate to confine appellate review to the transcript of the interrogation. Instead, as this appeal demonstrates, if the trial court has based its findings on conduct or behaviors that defendant exhibited during a videotaped interrogation that may be observed and analyzed with equal precision by an appellate court, a review of the videotape of the interrogation is appropriate.

[Ibid.]

Notably, the Court emphasized that it did not intend to elevate the appellate panel’s evaluation of the videotape over the factual findings of the trial court. Id. at 565-66, 34 A.3d 748. Rather, an *265 appellate panel can confine its review to the recording of the interrogation “[w]hen the trial court’s factual findings are based only on its viewing of a recorded interrogation.” Id. at 566, 34 A.3d 748. In Diaz-Bridges, it is clear that the Court referred to the videotaped statement to verify the findings of fact. The Court did not conduct a de novo review of the suppression hearing record.
B.
A confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her constitutional rights. Miranda, supra, 384 U.S. at 492, 86 S.Ct. at 1637, 16 L.Ed.2d at 734. A defendant may waive any or all of those rights; however, that waiver must be “voluntary, knowing and intelligent.” State v. Hreha, 217 N.J. 368, 382, 89 A.3d 1223 (2014).
In Miranda, supra, the United States Supreme Court held that in order to safeguard a suspect’s Fifth Amendment right against self-incrimination, confessions obtained during custodial interrogations are inadmissible as evidence unless the defendant has been advised of his or her constitutional rights. 384 U.S. at 492, 86 S.Ct. at 1637, 16 L.Ed.2d at 734; see Dickerson v. United States, 530 U.S. 428, 431-32, 120 S.Ct. 2326, 2329, 147 L.Ed.2d 405, 412 (2000).
The failure to administer Miranda warnings prior to custodial interrogation “creates a presumption of compulsion.” Oregon v. Elstad, 470 U.S. 298, 307, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222, 231 (1985). Hence, if warnings were required but not given, the unwarned statements must be suppressed — even when they “are otherwise voluntary within the meaning of the Fifth Amendment.” Ibid.; see also State v. O’Neill, 193 N.J. 148, 170, 936 A.2d 438 (2007); State v. O’Neal, 190 N.J. 601, 616, 921 A.2d 1079 (2007).
“Custodial interrogation” was defined by the United States Supreme Court as “questioning initiated by law enforce *266 ment officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. Thus, the protections provided by Miranda are only invoked when a person is both in custody and subjected to police interrogation. State v. P.Z., 152 N.J. 86, 102, 703 A.2d 901 (1997). Essentially, “Miranda turns on the potentially inquisitorial nature of police questioning and the inherent psychological pressure on a suspect in custody.” Ibid, (citing Miranda, supra, 384 U.S. at 445-58, 86 S.Ct. at 1612-19, 16 L.Ed.2d at 707-14).
“[C]ustody in the Miranda sense does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect’s home or a public place other than a police station.” Id. at 103, 703 A.2d 901 (internal quotation marks omitted). On the other hand, “[i]f the questioning is simply part of an investigation and is not targeted at the individual because she or he is a suspect, the rights provided by Miranda are not implicated.” State v. Timmendequas, 161 N.J. 515, 614-15, 737 A.2d 55 (1999) (citing State v. Pierson, 223 N.J.Super. 62, 67, 537 A.2d 1340 (App.Div.1988)), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151 L.Ed.2d 89 (2001). Moreover, “Miranda warnings are not re quired ‘simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.’” California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279-80 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977)); see State v. Marshall, 148 N.J. 89, 225-26, 690 A.2d 1, cert. denied, 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997).
Indeed, “[w]hether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernible.” State v. Stott, 171 N.J. 343, 364, 794 A.2d 120 (2002). “The critical determinant of custody is whether there has been a significant deprivation of the suspect’s freedom of action based on the objective circumstances, including the time and place of the interroga *267 tion, the status of the interrogator, the status of the suspect, and other such factors.” P.Z., supra, 152 N.J. at 103, 703 A.2d 901; see also Timmendequas, supra, 161 N.J. at 614, 737 A.2d 55.
The relevant inquiry is determined objectively, based on “how a reasonable [person] in the suspect’s position would have understood his situation,” Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317, 336 (1984); see P.Z., supra, 152 N.J. at 103, 703 A.2d 901, and “not on the subjective views harbored by either the interrogating officers or the person being questioned,” Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 298 (1994).
“Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.” Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307-08 (1980). “[T]he term ‘interrogation’ under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.” Id. at 301, 100 S.Ct. at 1689-90, 64 L.Ed.2d at 308; see State v. Bey, 112 N.J. 45, 68 n. 13, 548 A.2d 846 (1988).
Furthermore, the State bears the burden of proving beyond a reasonable doubt that a defendant’s confession is voluntary and not resultant from actions by law enforcement officers that overbore the will of a defendant. Hreha, supra, 217 N.J. at 383, 89 A.3d 1223; State v. Galloway, 133 N.J. 631, 654, 628 A.2d 735 (1993). The State bears a similarly high burden when a defendant challenges a statement procured by a law enforcement officer without the benefit of Miranda warnings. See State v. Clausell, 121 N.J. 298, 352-53, 580 A.2d 221 (1990).
We apply these principles to the facts of this case, focusing first on the deference owed by an appellate panel to a videotaped statement.
*268 V.
A.
This Court has subscribed unequivocally and continuously to the traditional rule that an appellate tribunal should adhere to the findings of fact of the trial court and must avoid disturbing those findings unless the evidential record provides insufficient support for those findings. Gamble, swpra, 218 N.J. at 424, 95 A.3d 188; Elders, supra, 192 N.J. at 243-44, 927 A.2d 1250; Locurto, supra, 157 N.J. at 470-71, 724 A.2d 234; Johnson, supra, 42 N.J. at 162, 199 A.2d 809. Notably, in Elders, supra, the Court rejected unequivocally the approach of the appellate panel in that case “that the availability of a videotape of the troopers’ encounter with defendants, particularly in the context of a hearing where witnesses testified, extinguishes the deference owed to a trial court’s findings.” 192 N.J. at 244, 927 A.2d 1250. The most oft-cited reason for such deference is the unique position of the trial court to observe the presentation of the evidence, to evaluate the demeanor of the witnesses, and to resolve discrepancies between testimony and physical or documentary evidence. Ibid. But, there are reasons beyond credibility determinations that require deference. The visual record simply cannot capture the entirety of an interrogation, an evidentiary hearing, or a trial because the focus of the camera is too narrow.
Recently, in Diaz-Bridges, supra, the Court referenced the videotape of the custodial interrogation of the defendant on several occasions. 208 N.J. at 551, 556, 562, 570, 34 A.3d 748. The Court explained that it did so because the question of whether a defendant has invoked the right to remain silent is a fact-sensitive inquiry that may require an evaluation of the words uttered by the suspect and his actions contemporaneous with any utterance in order to determine whether “the investigating officer should have reasonably believed that the right was being asserted.” Id. at 565, 34 A.3d 748. The Court emphasized, however, that it did not intend to alter the traditional appellate standard of review of trial court fact-finding and further delineated exceptionally limited *269 circumstances when appellate review required reference to the video record of an interrogation. Ibid. The Court stated:
We do not suggest that we have altered our admonition to appellate courts that they give due deference to the fact-finding role of the trial courts. See State v. Locurto, 157 N.J. 463, 471 [724 A.2d 234] (1999) (concluding that reviewing court should defer to factual findings of trial judge as long as they can reasonably be reached on sufficient credible evidence present in the record). Indeed, as we have recently reiterated, if the trial court has had the benefit of and has relied upon testimony of witnesses, appellate courts must give due deference to those findings because it is the trial court that had the opportunity to evaluate the credibility of the witnesses who appeared and testified. Elders, supra, 192 N.J. at 245 [927 A.2d 1250] (observing that trial court based its evaluation on police testimony because patrol ear’s videotape showed only part of interaction with individuals involved in traffic stop).
[Id. at 565, 34 A.3d 748.]
Thus, an appellate tribunal must defer to the factual findings of the trial court when that court has made its findings based on the testimonial and documentary evidence presented at an evidentiary hearing or trial. Deference is also not confined simply to credibility findings. To be sure, when the evidence consists of testimony of one or more witnesses and a videotaped recording of a statement by a witness or a suspect, an appellate court is obliged to review the entire record compiled in the trial court to determine if the factual findings are supported by substantial credible evidence in the record. Locurto, supra, 157 N.J. at 470-71, 724 A.2d 234. The appellate panel may reference a videotaped statement to verify a specific finding. It may not substitute its interpretation of events. An evidentiary hearing in the trial court or a trial conducted by a judge sitting without a jury is “the main event,” not a “tryout on the road.” See Wainright v. Sykes, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594, 610 (1977).
This appeal is not one of those cases in which the trial record was confined to a video record of the interrogation. We acknowledge that the trial court referred to the videotape of the October 20 interrogation and that certain findings of fact are premised on that review. Witness testimony, however, played a key role in the trial court’s analysis of the record and its findings *270 of fact. The trial court made repeated references to defendant’s interactions with police at his home. The trial court specifically noted that defendant’s daughter was being treated by emergency medical personnel at his home and then transported to the hospital by ambulance. Yet, the trial court found that Travahne sequestered defendant and then escorted defendant to the police station in a police vehicle. The trial court observed that a witness who was not suspected of a criminal act would not have been treated in that fashion. The trial court also expressly referred to the testimony provided by Travaline in which he initially described the circumstances of the child’s condition as “suspicious.” The trial court also referenced the detective’s initial interaction with defendant at the house, the creation of a crime log, the securing of the house, and the actions taken by police at the house before they escorted defendant to the police station to answer questions.
The trial court was uniquely situated to integrate the testimony and the video record to formulate its findings of fact. The appellate panel was not free to conduct a de novo review of the videotape, reject the findings of fact of the trial court, and substitute its own findings. The Appellate Division therefore erred when it dismissed the findings of fact of the trial court and conducted a de novo review of the record of the motion to dismiss.
Our review of the entire record, including the detective’s testimony and giving the required deference to the trial court’s findings, including those pertaining to the credibility of the detective, leads us to conclude that those findings are supported by the entirety of the testimonial and videotaped record. The final inquiry is whether the trial court properly applied the governing law to those factual findings to conclude that defendant was the subject of a custodial interrogation.
B.
The protections provided by Miranda apply only when a person is both in custody and subjected to police interrogation. P.Z., supra, 152 N.J. at 102, 703 A.2d 901. On the other hand, *271 mere investigative questioning directed at an individual who is not a suspect does not implicate Miranda. Timmendequas, supra, 161 N.J. at 614-15, 737 A.2d 55 (citing Pierson, supra, 223 N.J.Super. at 67, 537 A.2d 1340). Essentially, the issue hinges on the inquisitorial nature of the questioning and “the inherent psychological pressure” experienced by a suspect in custody. P.Z., supra, 152 N.J. at 102, 703 A.2d 901. “The critical determinant of custody is whether there has been a significant deprivation of the suspect’s freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors.” Id. at 103, 703 A.2d 901.
In the present case, the officers secured defendant’s house as a crime scene. The trial court found that Travaline directed defendant to ride in the police cruiser to the station. Meanwhile, his daughter was in critical condition and removed from her home by emergency medical personnel to a hospital for treatment. Although not handcuffed, defendant rode in the backseat of the vehicle. Defendant and Travaline did not converse at all during the drive.
Upon arrival at the station, defendant was directed into an interrogation room, where he sat alone for several minutes. When Travaline entered, he instructed defendant to move into the chair in the corner of the room, farthest from the door. The officer positioned himself between defendant and the door.
The detective questioned defendant for approximately an hour before exiting the room, leaving defendant to wait approximately two hours. The detective never advised defendant that he was free to leave, even after relaying the news that the hospital was able to restore and maintain his daughter’s heartbeat.
During the interview, the detective’s questions roamed far from merely obtaining information that might assist the child’s treatment. Specifically, the detective asked defendant to account for all of his movements on his return from work. He inquired whether defendant may have been distracted at any point while watching *272 his daughter, if he ever got frustrated with the baby, if he loved the baby, and if he ever resented the baby. Rather than an attempt to secure information that may have assisted the child’s treatment, the targeted questions reflect a clear attempt on the part of the detective to cause defendant to incriminate himself.
In light of the conditions, substance, and duration of the interview, combined with the events at defendant’s home, the trial court’s conclusion that the October 20 interview was custodial in nature is sufficiently supported by credible, factual evidence in the record and the proper application of governing law. The October 20 interview, conducted without administration of defendant’s Miranda rights, must be suppressed.
YI.
The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division for further proceedings.

 Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16L.Ed.2d 694 (1966).