**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4666-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

AMBER TOMPKINS,

    Defendant-Appellant.

_____

Submitted December 5, 2019 – Decided January 21, 2020

Before Judges Nugent and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-09-1491.

Joseph E. Krakora, Public Defender, attorney for appellant (Ruth Elizabeth Hunter, Designated Counsel, on the brief).

Christopher L.C. Kuberiet, Acting Middlesex County Prosecutor, attorney for respondent (Joie D. Piderit, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Charged in a six-count indictment with conspiracy, four controlled dangerous substance (CDS) offenses, and two weapons offenses, and her motion to suppress evidence having been denied, defendant pled guilty to the indictment's fourth count: third-degree possession with intent to distribute a CDS, less than one-half ounce of heroin. A judge sentenced defendant to a three-year probationary term, suspended her driver's license for six months, and imposed appropriate penalties, fees, and assessments. Defendant appeals. She presents a single argument:

> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS BECAUSE THE OFFICER DID NOT HAVE A PARTICULARIZED AND OBJECTIVE BASIS TO SUSPECT DEFENDANT HAD COMMITTED A CRIME.

Because the motion record supports the judge's findings of fact, and because his application of the law to those facts is sound, we affirm.

The State presented one witness at the suppression hearing. Defendant presented none. Joseph Angarone, a detective employed by the Mercer County Prosecutor's Office and assigned to the Mercer County Narcotics Task Force, had been working in that unit for more than ten years, had received training in narcotics investigations and undercover narcotic investigations, and had participated in more than 1000 narcotics-related arrests. He recounted how the

Task Force's ongoing investigation of a man who had sold heroin during controlled buys (the "Target") led to defendant's arrest.

Task Force officers arrested defendant on April 19, 2016. That morning, they began conducting surveillance of the Target from unmarked vehicles at "approximately 10 or 11:00 a.m." They first observed the Target at an apartment they believed based on their investigation to be his stash location, "a location where individuals place their narcotics and/or money." After visiting his stash location, the Target drove off in a white Lexus, and Task Force officers followed him in several unmarked cars.

The officers followed the Target to the parking lot of an auto parts store where he met an unknown white female driving a Toyota. The Target and the unknown white female had an "interaction" that lasted approximately twenty-five to thirty seconds before they drove away in their respective vehicles.

The officers followed the Target to a service area on the New Jersey Turnpike where he bought gas. Detective Angarone noticed that the same unknown white female arrived at the service area shortly thereafter in her Toyota. The Target and the unknown female left the service area in their respective vehicles and drove "pretty much in tandem" to a motel, where they parked in the rear of the building and sat in their vehicles for about a half hour.

At approximately 6:30 p.m., defendant arrived, driving a red Hyundai Elantra registered to her. She parked next to the Target's Lexus. There was a male passenger, later identified as Luis Saez, in defendant's Hyundai. The unknown white female remained in her vehicle while the Target, defendant, and Saez all exited their respective vehicles and engaged in a brief conversation. Saez, already wearing a backpack, removed from the Hyundai's trunk an additional bag, which Detective Angarone described as "a black bag, larger than a pocketbook but not huge like a hockey bag." The three walked to a motel room. They remained in the room for approximately a half hour. Defendant left the room carrying a different, smaller bag than the one Saez brought in. She placed it into the trunk of her car and then returned to the motel room where all three remained an additional ten minutes.

Soon thereafter, the Target, defendant, and Saez exited the room and returned to the cars they had arrived in. The unknown white female had departed while the others were still inside the motel. The Target, in the white Lexus, and defendant and Saez, in the red Hyundai, drove their separate ways. Other members of the Narcotics Task Force continued surveillance of the Target. Detective Angarone followed the Hyundai.

A-4666-17T4

Detective Angarone observed the Hyundai make two stops. First, it pulled over to the side of the road, approximately "[three] to 500 yards" from the motel, where another vehicle was parked nearby. An unknown male exited the parked vehicle and proceeded into the rear passenger seat of defendant's Hyundai. The unknown male was in the Hyundai for approximately twenty seconds before he left, got back into his vehicle, and drove away.

Detective Angarone continued to follow the Hyundai "three-tenths of a mile" to a convenience store parking lot. Another car was in the parking lot parked towards the outer perimeter. Defendant exited the Hyundai and got into the rear passenger side of the other vehicle. "[A]pproximately [five] or [ten] seconds" later, Detective Angarone watched defendant walk back to her car and depart from the parking lot.

Based on the totality of the circumstances he had observed, as well as his training and experience, Detective Angarone believed he had just witnessed a narcotics transaction. Officers executed a motor vehicle stop. Defendant does not challenge anything that happened after she was stopped.

Based on Detective Angarone's testimony, the judge denied defendant's suppression motion. The judge concluded that while any fact standing alone might not give rise to reasonable suspicion, under the totality of circumstances

A-4666-17T4

the detective presented "reasonable grounds for suspicion to investigate whether there was criminal activity afoot" based on "objective facts." We agree.

Our review of the grant or denial of a suppression motion is deferential. "[A]n appellate tribunal must defer to the factual findings of the trial court when that court has made its findings based on the testimonial and documentary evidence presented at an evidentiary hearing or trial." State v. Hubbard, 222 N.J. 249, 269 (2015). The deference extends to the trial court's credibility determinations. Ibid. We owe no special deference, however, to either a trial court's legal conclusions or "the consequences that flow from established facts." Id. at 263 (quoting State v. Gandhi, 201 N.J. 161, 176 (2010)).

Whether a reasonable and articulable suspicion exists depends upon the totality of the circumstances. State v. Pineiro, 181 N.J. 13, 22 (2009). In determining the issue, a court must consider whether the "historical facts, viewed from the standpoint of an objectively reasonable police officer," amount to reasonable suspicion. State v. Stovall, 170 N.J. 346, 357 (2002) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). A court may also consider an officer's experience and knowledge in applying the totality of the circumstances test. Id. at 361. "[D]ue weight [is] given . . . to the specific reasonable inferences which [an officer] is entitled to draw from the facts in

A-4666-17T4

light of his [or her] experience." Ibid. (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)).

Defendant argues that because Detective Angarone witnessed no evidence of criminal activity, heard no statements implying criminal activity, observed defendant engaged in no criminal activity, and observed defendant make no furtive or nervous movements indicative of criminal activity, he did not have a reasonable and articulate suspicion of criminal activity. Defendant emphasizes that neither she nor Saez were targets of the police surveillance.

We reject defendant's arguments, because they do not take into consideration Detective Angarone's experience and knowledge and do not give due weight to the specific and reasonable inferences which Detective Angarone was entitled to draw from the facts in light of his experience.

The detective knew the Target sold drugs because the task force had conducted two controlled buys from him. The Target drove to the motel where he met defendant after first stopping at his stash house. Defendant and Saez went into the motel with the Target and emerged with a bag which was placed in the trunk of defendant's car. When defendant left the motel parking lot, she made two short stops within a relatively short distance, met two individuals, had a brief encounter with each, and then left.

Viewed from the standpoint of an objectively reasonable police officer, these facts gave rise to a reasonable suspicion that the Target left his stash house with CDS, which he supplied to defendant, who in turn, with her companion, sold it to two others. The standard is whether a reasonable and articulate suspicion exists under the historical facts, viewed from the standpoint of an objectively reasonable police officer. Here, as the trial court determined, such a suspicion existed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4666-17T4