**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2523-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JERYL MIDDLETON,

     Defendant-Appellant.

_____

Submitted March 21, 2022 – Decided June 23, 2022

Before Judges Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 18-01-0101.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jeryl Middleton appeals from a judgment of conviction that was entered on November 14, 2018, after defendant pled guilty to one count of second-degree witness tampering, N.J.S.A. 2C:28-5(b), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). The trial court sentenced defendant consistent with his plea agreement to an aggregate seven-year term with a forty-two-month period of parole ineligibility.

On appeal, defendant challenges his conviction by arguing the trial court erred by denying his motion to suppress the inculpatory, custodial statement he gave to law enforcement. Specifically, defendant argues the following one point:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS HIS STATEMENT BECAUSE THE RECORD CLEARLY DEMONSTRATES THAT HIS PROLONGED CONFINEMENT AMONG CO-DEFENDANTS WHO PRESSURED HIM TO TALK RENDERED HIS WAIVER OF THE RIGHT TO REMAIN SILENT INVOLUNTARY.

Having carefully reviewed the record, we disagree with defendant's contention and affirm.

The facts leading to defendant's arrest and conviction are well-known to the parties and for our purposes need not be set forth at length in this opinion.

2

Suffice it to say that defendant was arrested after pointing a handgun at an individual in order to scare that person into not reporting him to police about an unrelated alleged criminal act. A day after his August 16, 2017 arrest, defendant provided an inculpatory statement to police in response to their interrogation. Thereafter, a grand jury issued an indictment charging defendant with various offenses, including the two to which he ultimately pled guilty.

Prior to pleading guilty, defendant filed a motion to suppress the statement he gave to police. In response, the trial court conducted an evidentiary hearing at which the only witnesses were Perth Amboy Police Officers George Irizarry and Davis Salazar, and defendant. Prior to considering the testimony, the trial court reviewed the video tape of defendant's interrogation, portions of which were played back again during the hearing.

Officer Irizarry was the first to testify. He confirmed that he and other officers like him who are assigned to desk duty are responsible for checking holding cells prior to a prisoner being placed inside and ensuring that all dangerous items are removed from prisoners before they are placed in the cell. They are also responsible for performing inspections of the prisoner every thirty minutes while he or she is inside the holding cell. When not conducting those

inspections, the on-duty officer has cameras at the desk that provide the officer with the ability to see the holding cell area at all times.

As to defendant, Irizarry testified about the completion of the confinement report for defendant and the monitoring records that were prepared during his incarceration in the holding cells. According to the records that were admitted into evidence, defendant was placed in a cell at 6:41 p.m. on August 16 by another police officer. The next morning, Irizarry assumed responsibility for defendant and made various entries in the monitoring records, indicating notes about his observations of defendant.

Those records indicated that defendant received food once and was lying in his cell at various times during the night. Irizarry had no recollection of whether defendant was sleeping soundly or if defendant ever asked for any medical attention. If he had, then an ambulance would have been called to attend to defendant and the request would have been noted on the records. There were no such notations.

The records also did not indicate that defendant got sick to his stomach or vomited in his cell. If he had, it would have been notated in the records and he would have been removed from his cell so that it could be cleaned.

4

Officer Salazar testified next. He was the desk monitor prior to Irizarry beginning his shift. According to Salazar, he conducted the inspections every thirty minutes between 3:00 a.m. and 8:00 a.m., and defendant appeared to be sleeping the entire night. Although Salazar could not be sure defendant was sleeping, he did note that his eyes were closed during the inspections. Salazar did not notice whether defendant got sick or vomited.

Salazar also confirmed his notations in the monitoring records that were made during his shift, which did not include any indication that anyone removed defendant from the cell or went into the cell. Salazar also confirmed that defendant never made any complaints.

Defendant was the last witness to testify. According to defendant, prior to being taken for interrogation, he was intimidated by detectives and his codefendants, who were incarcerated in the next cell, in an effort to pressure him to give a statement to the police. Defendant began to become anxious and eventually started feeling sick. He confirmed that he was given a "fast-food meal" that made him vomit in his cell within an hour after eating the meal. Thereafter, he requested medical attention but was told that it would not be provided until he gave a statement.

5

Defendant disagreed with the officers' testimonies that he was lying down in his cell during the night. According to defendant, he spent most of the time on his feet, feeling exhausted and ill. Defendant also claimed that he got into an altercation with one of the police officers who was conducting inspections of his cell and, despite his request for medical attention, he did not receive any until he gave his statement, just before he was taken to the county facility.

According to defendant, it was only after being in custody for nineteen hours under these conditions that he finally gave the statement to police because he believed that was the only way he could be released from custody. Although he still felt ill at the time, defendant confirmed that at 9:32 a.m. on August 17 he signed the Miranda[1] waiver form and provided a statement to the police.[2] Notably, defendant did not dispute that he received the correct warnings or that he understood them. And, in response to questions posited by the trial court, defendant confirmed that he made no request for medical attention during the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] There were inconsistencies between the monitoring records' time entries as compared to the interrogating officers' recording of the times defendant was questioned and returned to his cell. Those inconsistencies are not pertinent to the appeal.

A-2523-19

time that he was giving his statement to police or otherwise indicate he was not feeling well during that time.

After the completion of the testimony, counsel presented closing arguments to the trial court. Defendant specifically argued that

> under the totality of the circumstances [defendant's] statement [could not] be considered to be knowing, voluntary, and intelligent[ as] [h]e was deprived of sleep after a too lengthy detention, and it certainly, in any objective person, would create the impression I'm not going to get out of here until I tell them what they want to hear. . . . .
>
> Additionally, [the police] added the extra layer of pressure of obviously agitating his co-defendants against him . . . with the theory of . . . you're only here because of [defendant]. So he had the pressure of both the codefendants and law enforcement pressuring him.
>
> He wasn't feeling well. . . . . He reacted poorly to the . . . food . . . . No sleep, feeling ill, asked for medical attention, pressured by law enforcement and his co-defendants who strategically placed them by him so he could be pressured without any hope of ever leaving until he gave the statement.

Counsel was also concerned about the State's failure to produce the video of the holding cell taken during the defendant's confinement.

After considering the parties' arguments, the trial court placed its reasons on the record. The court found that both officers were credible; and as to defendant there was not "anything to corroborate" defendant's self-serving

statements that he was deprived of sleep, felt ill after he ate at 12:40 a.m., and that he vomited, which were contradicted by the confinement records. The court noted defendant testified that an ambulance arrived there after he gave his statement, but it was determined that he was not sick and he was transferred to the county jail.

After reviewing the case law, the court found that defendant was subject to custodial interrogation and that, based on its review of the video tape, "defendant was properly advised of his Miranda warnings" and confirmed that he understood them verbally as well as when he signed the waiver certificate at 9:32 a.m.

The court turned next to the issue about whether the waiver was "voluntary, knowing, and intelligent." The court observed that the defendant gave two statements, one that lasted from approximately 9:30 a.m. to 10:00 a.m. and then he was briefly brought back for additional questioning for "just several minutes." The court also noted that defendant was initially given his Miranda warning, and at the second interrogation he "was informed that his Miranda rights still apply and [asked] if he had any questions regarding his Miranda rights" to which defendant confirmed "he understood."

A-2523-19

The court was satisfied from the video tape that the State met its burden of proof. The court highlighted that there was no indication that "defendant [was] in any distress at the time of the questioning." The court rejected defendant's contentions, finding "for the majority of the time [d]efendant was in the cell, he was at least lying down and not in any discomfort or distress." Based on that evidence, the court found that defendant's contentions were "not only disingenuous, but frankly without merit."

According to the court, in the video, defendant appeared "relaxed, somewhat comfortable." The court found there was no "pressure applied or any deception involved, and at no point [did] . . . defendant ever ask for an attorney during the interview," and "it[ was] evident that he[ was] not tired, even though he had been detained for some time there."

Turning to defendant's demeanor during his interrogation, the court observed that defendant was "calm, willing to describe the assault in question" and "[h]e [gave] some significant details as to the reason behind, [the] motivation in . . . assaulting the victim. The officers don't appear to intimidate the defendant in any manner."

At the conclusion of the hearing, the court entered an order memorializing its decision. Thereafter, defendant pled guilty as noted earlier and was subsequently sentenced. This appeal followed.

On appeal, defendant argues that, while the trial court found insufficient evidence that defendant was ill or deprived of sleep, the court did not make any findings that, as defendant argued, his waiver was involuntary because he spent nineteen hours in confinement, was subjected to pressure from his co-defendants who were in adjacent cells, or because "he was suffering from anxiety and was repeatedly pressured by police to waive his right to remain silent." According to defendant, if the trial court had accounted for those circumstances, it could not have found that defendant's waiver was "knowing, intelligent, and voluntary." We disagree.

Our "review of a trial court's factual findings at an evidentiary hearing is limited." State v Cotto, ___ N.J. Super. ___, ___ (App. Div. 2022) (slip op. at 20) (citing State v. Hubbard, 222 N.J. 249, 269 (2015)). We give deference to a trial court's findings of fact on pre-trial suppression motions and will not reverse unless the findings are so mistaken and unsupported by the evidence that it is necessary to intervene. State v. S.S., 229 N.J. 360, 374 (2017); see also State v. Sims, 250 N.J. 189, 210 (2022) (stating "we defer to the factual findings

of the trial court if those findings are supported by sufficient credible evidence in the record"). Of particular significance to this case, in <u>S.S.</u>, the Supreme Court held that this deferential standard of review applies to the interpretation of video and documentary evidence, as well as to live testimony taken at pretrial hearings. 299 N.J. at 374. "In contrast to the deference we owe to a trial court's factual findings, a trial court's interpretation of the law and 'the consequences that flow from established facts are not entitled to any special deference.'" <u>Cotto</u>, ___ N.J. Super. at ___ (slip op. at 20) (quoting <u>State v. Gamble</u>, 218 N.J. 412, 425 (2014)).

In reviewing whether a trial court correctly denied a motion to suppress an inculpatory statement given to police by a defendant while in custody, we weigh the facts found by the trial court against the well-settled ideal that "[t]he privilege against self-incrimination, as set forth in the Fifth Amendment to the United States Constitution, is one of the most important protections of the criminal law." <u>Id.</u> at ___ (slip op. at 19) (alteration in original) (quoting <u>Sims</u>, 250 N.J. at 211). As the Supreme Court has explained, "New Jersey law 'maintains "an unyielding commitment to ensure the proper admissibility of confessions."'" <u>Ibid.</u> (quoting <u>Sims</u>, 250 N.J. at 211).

Here, the question before the court was not whether the defendant waived his rights, but whether "the State [proved] beyond a reasonable doubt that the waiver was given knowingly, voluntarily, and intelligently in light of all the circumstances." Id. at ___ (slip op. at 20-21). When a trial court determines the State met its burden and admits the statement into evidence, "[we] engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." Id. at ___ (slip op. at 19-20) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)). In doing so, we hew to our already noted mixed standard of review. Like the trial court, we consider "the totality of the circumstances," based on the facts as found by the trial court that were supported by the evidence, to determine whether the trial court correctly admitted an inculpatory custodial statement. State v. L.H., 239 N.J. 22, 42-43 (2019).

Here, we conclude the trial court properly considered the totality of the circumstances in deciding whether defendant's statement was given knowingly, voluntarily, and intelligently based on the evidence presented at the hearing, including the video tape. We agree with the trial court's conclusions that no evidence demonstrated defendant's statement was coerced as there was no indication in the record that his will was overborne or that his statement was otherwise given involuntarily.

We affirm therefore for the reasons stated by the trial court in its cogent oral decision. We conclude defendant's argument to the contrary is without sufficient merit to warrant further discussion in a written opinion, R. 2:11-3(e)(2), as there is nothing in the record to support defendant's allegations that his statement was given as a result of being harassed by police or co-defendants or the result of being ill, either while incarcerated or while he gave his statement.[3]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] We note that we also conclude that defendant's reliance on State v. Kelly, 61 N.J. 283, 286-87, 294 (1972), is inapposite because there the issue was whether defendant was entitled to a hearing on the admission of inculpatory statements given to private citizens, as compared to law enforcement personnel, in response to alleged physical coercion.

A-2523-19