# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0281-23

STATE IN THE INTEREST
OF J.S., a juvenile.

Submitted October 2, 2024 – Decided December 23, 2024

Before Judges Rose and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FJ-08-0137-23.

Jennifer Nicole Silletti, Public Defender, attorney for appellant J.S. (Michael Denny, Assistant Deputy Public Defender, of counsel and on the brief).

Elizabeth Parvin, Acting Gloucester County Prosecutor, attorney for respondent (Michael Mellon, Special Deputy Attorney General/Acting Assistant Prosecutor, on the brief).

PER CURIAM

J.S.[1] appeals from a juvenile adjudication of delinquency for conduct that, if committed by an adult, would constitute the third-degree crime of public false alarm, N.J.S.A. 2C:33-3(a)(1)(a).  We affirm.

## I.

J.S., who was then twelve years old, A.A. (Adam) and nearly fifty other middle-school students were members of a social media group chat.  Neither J.S. nor Adam knew all the members of the group, which was often used to send "memes,[2] funny videos, or[ . . .] just videos."  According to Adam, the group did not discuss "serious things," and J.S. agreed to its characterization as "kids [his] age joking around."

On October 24, 2022, J.S. sent a message to the group chat which said, "About to shoot the school up tomorrow."  Adam responded:

> Fr[3] same
> Ima boutta bring 2 bomb s
> Am tired of school

---

[1]  Because juvenile delinquency records are exempt from public access pursuant to Rule 1:38-3(d)(5), we use initials and pseudonyms for minors, family members and others involved in this matter.

[2]  Adam described a "meme" as "a joke but in a picture and they have words." Adam agreed with defense counsel's characterization of a meme as "a picture of something and then perhaps there [are] words on top of the picture making a joke."  J.S. also described a meme as a "picture that's . . . funny."

[3]  Adam clarified that "Fr" means "for real" in their texting lingo.

A-0281-23

J.S. replied, "Fr."

I.C. (Isaac), who was not in the group chat, received from another student a screenshot of the messages sent by J.S. and Adam, and believed a school shooting might occur. On the morning of October 25, 2022, Isaac showed his mother Z.C. (Zoe) the screenshot. Zoe then went to J.S.'s school, reported the messages to the principal and emailed him the screenshot. The principal immediately alerted the school resource officer, who contacted the local police department. Zoe testified she sent the email "because [she] was concerned. [She] didn't know if it was a kid just joking about a matter or if it was something that was more serious."

> The principal did not immediately evacuate the school because

> > that would not necessarily be a good response in that situation. You need to evaluate the threat and determine what the appropriate step would be. If you have a situation, you know, if we had a real situation, that might be exactly what the individual would want us to do is to evacuate the building. So . . . we're trying to assess . . . if it's an imminent threat and determine what our next step would be.

The principal further testified he did not have the full context of the group chat, but no other independent threats were made against the school.

The principal contacted a student whose name he recognized in the screenshot, and the student believed J.S. sent the threatening message. The

3

principal then questioned J.S., who acknowledged he posted the message, but said it was in reference to a "gore video." J.S. did not have any weapons on him and the principal determined the message did not require an evacuation or lockdown of the school at that time.

A township police officer further investigated the matter. He visited J.S.'s residence, spoke to J.S.'s family members and, with their consent, obtained J.S.'s iPad. Pursuant to a communications data warrant, the investigator extracted data from the iPad, reviewed a substantial portion of the social media group chat history, and located the messages J.S. and Adam sent to the group chat. On November 11, 2022, J.S. was charged in a juvenile complaint with public false alarm.

The judge adjudicated the charge on July 12, 2023. During the proceeding, J.S. testified on his own behalf. On direct examination, he stated he sent the message "as a joke," he did not think the members of the group chat "were going to take it serious[ly]," and he did not want to harm, hurt or scare anyone. J.S. thought other people in the chat would perceive the message as a joke, and did not believe anyone would contact the police. J.S. also believed the message Adam sent was a joke.

A-0281-23

On cross-examination, J.S. was asked, "How would you know how people that you don't know would react to a message that's being sent like that?" to which he responded, "I thought they were going to take it as a joke because, like, the group chat was just, like, about—just about jokes and memes and all that." J.S. was then asked, "How is, 'About to shoot the school up tomorrow,' in a group chat of forty to fifty people, how is that funny? How is that a joke?" to which J.S. responded, "Because that's what just—like, we just say, like, like, dumb stuff in the group chat that we just talk or just memes and that I just said a random thing." J.S. confirmed he did not have any access to firearms or weapons, and he did not intend to carry out a shooting. He was aware the school had a protocol for active shooters because he had practiced active shooter drills, and knew an evacuation was possible if there were an active shooter.

The judge found all the State's witnesses credible. She found J.S. not credible in some respects, particularly his testimony on direct examination, but found him credible in other respects, particularly his testimony on cross-examination. On August 23, 2023, she entered a final disposition order

A-0281-23

adjudicating him delinquent of the charge and imposing a twelve-month deferred disposition.[4]

J.S. presents a single issue for our consideration:

THE TRIAL COURT ERRED BY FINDING THAT J.S. KNEW BEYOND A REASONABLE DOUBT THAT HIS JOKE TO A GROUP OF FRIENDS ON [A GROUP CHAT] WAS LIKELY TO CAUSE PUBLIC ALARM.

II.

"In the appeal of a juvenile delinquency adjudication, '[o]ur standard of review is narrow and is limited to evaluation of whether the trial judge's findings are supported by substantial, credible evidence in the record as a whole.'" State in the Int. of D.M., 238 N.J. 2, 15 (2019) (quoting State in the Int. of J.P.F., 368 N.J. Super. 24, 31 (App. Div. 2004)). We determine whether those findings "could reasonably have been reached on sufficient credible evidence present in the record as a whole." Ibid. (quoting State in the Int. of S.B., 333 N.J. Super. 236, 241 (App. Div. 2000)). "If we are satisfied that the findings and result meet this criterion, our task is complete, and we may not disturb the result, even

---

[4] Pursuant to N.J.S.A. 2A:4A-43(b)(1), a deferred disposition "[a]djourn[s] formal entry of disposition of the case for a period not to exceed [twelve] months for the purpose of determining whether the juvenile makes a satisfactory adjustment, and if during the period of continuance the juvenile makes such an adjustment, [the court will] dismiss the complaint."

though we may feel we may have reached a different conclusion." Ibid. (quoting State in Int. of S.B., 333 N.J. Super. at 241).  However, we review a trial court's legal conclusions de novo.  Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019).

It is well established that the State is required to prove every element of a criminal offense beyond a reasonable doubt.  State v. Delibero, 149 N.J. 90, 99 (1997).  The same allocation of the burden of proof applies in juvenile delinquency proceedings. See State in the Int. of J.G., 151 N.J. 565, 593-94 (1997).

N.J.S.A. 2C:33-3(a)(1)(a) provides:

> [A] person is guilty of a crime of the third degree if he initiates or circulates a report or warning of an impending fire, explosion, crime, catastrophe, emergency, or any other incident knowing that the report or warning is false or baseless and that it is likely to cause evacuation of a building, place of assembly, or facility of public transport, or to cause public inconvenience or alarm.

N.J.S.A. 2C:2-2(b)(2) defines "knowingly":

> A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence.  A person acts knowingly with respect to a result of his conduct if he is aware that it is

7

practically certain that his conduct will cause such a result.

The first element of N.J.S.A. 2C:33-3(a)(1)(a) requires the State prove "the defendant knowingly initiated or circulated a report or warning of an impending fire, or explosion, or bombing, or crime, or catastrophe, or emergency." Model Jury Charges (Criminal), "False Public Alarms (N.J.S.A. 2C:33-3)" (approved Oct. 17, 1988).

Here, the judge determined:

> [J.S.] knew there were forty to fifty people in that [group chat]. He knew some of them, some them were his friends, . . . he acknowledged that there was a large group of people . . . who he did not know. There's no question that when he sent that statement, "About to shoot the school up tomorrow," that he . . . knowingly circulated a report or a warning of an impending . . . catastrophe or emergency.

The judge further found:

> [T]here is no question in this court's mind that the State has proved beyond a reasonable doubt that [J.S.] sent these exchanges on [the group chat]. We had corroborating testimony and [J.S.] admitted it. But . . . when his friend commented, "FR," which he testified was, "For real, same," [J.S.]'s response to that was, "For real." He didn't say it was a joke, he didn't say just kidding, . . . he said, "For real," or he said, "FR," which the court interprets meaning for real.

A-0281-23

The second element of N.J.S.A. 2C:33-3(a)(1)(a) requires the State prove "the defendant knew that the report or warning that he/she initiated or circulated was false or baseless." Model Jury Charges (Criminal), "False Public Alarms (N.J.S.A. 2C:33-3)" (approved Oct. 17, 1988).

The judge concluded:

> [J.S.] knew that the statement was false or baseless. He acknowledged that on the stand, he acknowledged that in his own testimony. His principal indicated he had never brought a weapon to school. No one had any indication that he had access to any type of a gun. He knew the report was false or baseless and that is also substantiated by his position or his testimony that it was a joke.

The third element of N.J.S.A. 2C:33-3(a)(1)(a) requires the State prove "the defendant knew the false or baseless report or warning initiated or circulated by him/her was likely to cause the evacuation of a building, or a place of assembly, or a facility of public transport, or to cause public inconvenience or alarm." Model Jury Charges (Criminal), "False Public Alarms (N.J.S.A. 2C:33-3)" (approved Oct. 17, 1988).

As to this element, the judge found:

> [J.S.] knew that the report or warning was likely to cause evacuation of a building, a place of assembly, facility of public transport, or he knew that the report or warning was likely to cause public inconvenience or alarm. From his own testimony, he acknowledged that

9

he had some awareness that statements like this could scare or alarm other people.

She further concluded:

> [T]he court takes into consideration that . . . [J.S.] acknowledged he knew that these type of statements could cause alarm or annoyance . . . or alarm to the other young people on the [group chat] . . . . [J.S.] also was aware that if there was an issue at school, if there was a threat at school, that protocol was for the school to be evacuated . . . .

We are unpersuaded by J.S.'s contention the judge erred by affording more weight to J.S.'s testimony on cross-examination than his testimony on direct examination. We give deference to credibility findings. State v. Hubbard, 222 N.J. 249, 264 (2015) (citation omitted). "Appellate courts owe deference to the trial court's credibility determinations as well because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).

In considering J.S.'s differing testimony on direct and cross-examination, the judge found:

> [J.S.] thought it was just he and his friend joking around [making] those statements, but the thing that I think contradicts that—or his statements that it was a joke, is when asked [during cross-examination] about why he did not continue to talk about it, he said he didn't want anyone to get scared or alarmed. . . . [T]hat tells the

court he recognized that these type[s] of conversations can be alarming and frightening to other people.

The judge noted J.S.'s statements on direct and cross-examination were contradictory and explained her reasons for affording more weight to his statements on cross-examination. In light of our deferential standard when reviewing credibility determinations, we discern no abuse of discretion here.

We are also unpersuaded by J.S.'s argument the State failed to prove he was "practically certain" the group chat message was likely to cause public alarm.[5] Having reviewed the trial record and the judge's findings with regard to each element of the offense, we are satisfied the adjudication is supported in the record as a whole.

Finally, J.S. points to the recognition that juveniles are more reckless than adults due to their stage of brain development. He cites Miller v. Alabama, 567 U.S. 460 (2012); State v. Comer, 249 N.J. 359 (2022); and State v. Zuber, 227 N.J. 422 (2017), all of which concern how and why courts should address juvenile offenders differently than adult defendants.

---

[5] We decline to consider J.S.'s arguments that rest on an unpublished decision because "[n]o unpublished opinion shall constitute precedent or be binding upon any court." R. 1:36-3.

We recognize "juveniles are different from adults—that juveniles are not fully formed, that they are still developing and maturing, that their mistakes and wrongdoing are often the result of factors related to their youth, and therefore they are more amenable to rehabilitation and more worthy of redemption." State in the Int. of C.K., 233 N.J. 44, 67 (2018). One purpose of the juvenile code is "to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program of supervision, care and rehabilitation, and a range of sanctions designed to promote accountability and protect the public." N.J.S.A. 2A:4A-21(b). We are satisfied the juvenile justice system here accounted for these considerations, as reflected in the judge's imposition of a deferred disposition that, depending on J.S.'s conduct, may result in dismissal of the complaint.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0281-23