SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Zakariyya Ahmad (A-54-19) (083736)**

**Argued October 27, 2020 -- Decided June 15, 2021**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

In this case, the Court considers whether defendant Zakariyya Ahmad's statement to police -- which occurred when defendant was 17 years old and without his being advised of his Miranda rights -- was properly admitted at his trial for multiple offenses related to the murder of a café owner in Newark.

On October 27, 2013, defendant, who had turned seventeen just two months earlier, arrived at the Emergency Room at University Hospital in Newark at 11:20 a.m. He had been shot in his left arm and leg. A detective and two other officers from the Newark Police Department (Newark PD) arrived at the hospital shortly after defendant. The detective asked defendant where he was shot and how he got to the hospital. While medical professionals were tending to defendant, his mother, father, and other family members arrived. Defendant was discharged at 2:30 p.m.

Upon discharge, instead of being allowed to go home with his family, defendant was advised by Newark Police officers that he had to report to the Newark PD. According to defendant's testimony at the evidentiary hearing, officers told him he had no choice in the matter. Officers escorted defendant from the hospital to a marked police car, put him in the back seat, and drove him to Newark PD's Major Crimes Unit. Defendant's mother testified that officers told her she could not take defendant home or drive him to the police station from the hospital.

Eventually, Detective Rashaan Johnson of the Essex County Prosecutor's Office (ECPO) told defendant and his father to drive to the ECPO for further questioning. Defendant rode with his father to the ECPO, but they were escorted there by Detective Johnson. Earlier in the day, Detective Johnson had been dispatched to investigate a homicide. Joseph Flagg, the owner of Zakkiyah's Café (the Café), had been shot and killed in an apparent robbery attempt. When Detective Johnson arrived at the Café, he learned that a gunshot victim at University Hospital had reported being shot about four blocks away from the Café earlier that morning. Upon leaving the Café, Detective Johnson went to Newark PD, where he met defendant and his father and then escorted them to the ECPO for questioning.

1

At the ECPO, Detective Johnson placed defendant in an interview room apart from his parents. Defendant was told that the interview was being recorded but was not advised of his Miranda rights. According to Detective Johnson, he did not suspect defendant of killing Flagg or robbing the Café at that time. Defendant narrated his version of the events of the day, stating that he was shot while walking on the street and that he flagged down Steffon Byrd, who drove defendant to the hospital along with two other men. Defendant stated that he recognized the two other passengers but did not know their names. The interview concluded after twenty-seven minutes. Defendant's mother testified that she asked for the interview to cease because she saw an officer enter the interview room holding what she believed to be a forensic kit.

Detective Johnson later matched the bullet removed from defendant's ankle and blood swabbed from defendant's pants to physical evidence found at the Café. According to Detective Johnson, it was at that point that defendant became a suspect in Flagg's murder. Detective Johnson also reviewed surveillance footage from the morning of the murder; it captured defendant, Ja-Ki Crawford, and Daryl Cline exiting the Café. Crawford gave a statement to the ECPO incriminating defendant and Cline, stating Cline had shot and killed Flagg and inadvertently shot defendant in the course of an attempted robbery of the Café. Crawford reached an agreement with the ECPO pursuant to which he would cooperate and plead guilty in exchange for being sentenced as a juvenile.

Defendant was indicted, and a pretrial evidentiary hearing was held to address the State's motion to admit defendant's videotaped statement at trial. The court granted the motion, finding that defendant was interrogated as a shooting victim, not a suspect.

At trial, Byrd testified that defendant was running down the street with Crawford and Cline when the trio asked Byrd to drive defendant to the hospital. Crawford recanted the version of events he gave earlier, testifying instead that he was at the Café when an argument erupted between Cline and Flagg and that defendant, his close friend at the time, was trying to deescalate the argument when Flagg attacked him. The State played defendant's statement, which was inconsistent with Crawford's and Byrd's testimonies and did not account for the physical evidence obtained at the Café. Defendant did not testify. The jury convicted defendant on all charges except first-degree murder.

The Appellate Division affirmed, agreeing that defendant was questioned as "part of an investigatory procedure rather than a custodial interrogation" and that Miranda was therefore not implicated. The Court granted certification, "limited to the issue of whether defendant's statement was obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966)." 241 N.J. 161 (2020).

**HELD:** Pursuant to the facts of this case, a reasonable 17-year-old in defendant's position would have believed he was in custody and not free to leave, so Miranda warnings were required. It was harmful error to admit his statement at trial.

2

1.  The privilege against self-incrimination is one of the most important protections of the criminal law.  Individuals who are "subjected to police interrogation while in custody . . . or otherwise deprived of [their] freedom of action in any significant way" must be advised of certain rights so as to not offend the right against self-incrimination.  Miranda, 384 U.S. at 477-79.  Once advised of their Miranda rights, defendants may knowingly and intelligently waive those rights and make a statement or answer law enforcement's questions.  Id. at 479.  If Miranda warnings are required but not given, the unwarned statements must be suppressed.  Miranda is triggered only when a person is in custody and subject to questioning by law enforcement.  Whether an individual is "in custody" for purposes of administering Miranda warnings is a fact-sensitive inquiry.  The inquiry is an objective one, determined by how a reasonable person in the suspect's position would have understood his situation.  Juveniles are afforded the same protections of the privilege against self-incrimination as adults.  (pp. 21-24)

2.  The trial court focused almost exclusively on what occurred during the interview.  The Court's analysis, however, ends at the moment defendant was placed in the back of a patrol car and transported to the Newark PD, having been told that he could not leave the hospital with his parents.  At that moment, looking objectively at the totality of the circumstances, it is difficult to conceive that any reasonable 17-year-old in defendant's position would have felt free to leave; nor did any subsequent events do anything to lessen that impression.  By any objective measure, from the moment defendant left the hospital, he was in a continued state of law enforcement custody.  As a result, the detectives should have given defendant Miranda warnings prior to taking his statement.  Whether defendant was viewed as a victim by law enforcement at the time of questioning is not, and has never been, the relevant inquiry under Miranda for determining whether someone is in custody.  Defendant's statement should have been suppressed.  (pp. 24-27)

3.  The error in admitting defendant's statement was harmful, that is, "clearly capable of producing an unjust result."  R. 2:10-2.  Crawford, the State's key witness, testified at trial that his previous statements were false, and he professed defendant's innocence.  Defense counsel presented a defense in line with Crawford's trial testimony -- that defendant was simply in the wrong place at the wrong time.  Defendant's statement to detectives, however, contradicted Crawford's trial testimony and defendant's asserted defense; it was thus a damning piece of evidence that cast defendant as a liar.  The State argues that it presented overwhelming evidence of defendant's guilt "independent of defendant's statement."  But the State unquestionably relied on the statement in attempting to convince the jury that defendant was guilty, so admission of the statement cannot possibly be viewed as harmless.  (pp. 27-29)

**REVERSED and REMANDED for a new trial on the counts of conviction.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion.**

SUPREME COURT OF NEW JERSEY

A-54 September Term 2019

083736

State of New Jersey,

Plaintiff-Respondent,

v.

Zakariyya Ahmad,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| October 27, 2020 | June 15, 2021 |

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the briefs).

Caroline C. Galda, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney; Caroline C. Galda, of counsel and on the briefs, and Stephen A. Pogany, Special Deputy Attorney General/Acting Assistant Prosecutor, on the briefs).

William J. Munoz argued the cause for amici curiae Association of Criminal Defense Lawyers of New Jersey, American Civil Liberties of New Jersey, and Northeast Juvenile Defender Center (Whipple Azzarello, Rutgers Criminal and Youth Justice Clinic, and American Civil Liberties Union of New Jersey Foundation, attorneys; William J. Munoz, Laura Cohen, and Alexander Shalom, on the brief).

Frank Muroski, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Frank Muroski, of counsel and on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

In this case, defendant Zakariyya Ahmad appeals from his conviction of multiple offenses related to the murder of a café owner in Newark. We are asked to determine whether defendant's statement to police -- which occurred when defendant was 17 years old -- was properly admitted at trial. At the time defendant gave the statement, he had been shot several times hours earlier, had been heavily medicated, and had undergone surgery to remove a bullet from his leg. As he was released from the hospital, still wearing bandages and a hospital bracelet and walking with the assistance of crutches, law enforcement placed defendant in the back of a patrol car and transported him to the Newark

Police Department for questioning.  The officers did not advise defendant of his Miranda[1] rights in advance of the interrogation.

Defendant was later tried and convicted.  The Appellate Division affirmed his conviction and the trial court's denial of the motion to suppress his statement, finding that defendant presented himself to police as a victim, so Miranda warnings were not required.  We find that, pursuant to the facts of this case, a reasonable 17-year-old in defendant's position would have believed he was in custody and not free to leave, so Miranda warnings were required.  We hold that it was harmful error to admit his statement at trial and reverse.

I.

A.

We rely on testimony from the trial and the pretrial evidentiary hearing for the following summary.

On October 27, 2013, defendant Zakariyya Ahmad arrived at the Emergency Room at University Hospital in Newark at 11:20 a.m. complaining of significant pain in his left arm and left leg.  Defendant, a minor who had turned seventeen just two months earlier, had been shot multiple times.  A physical examination of defendant revealed gunshot wounds to his left forearm, left hand, left thigh, and left ankle.  A bullet was still lodged in his

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

3

left ankle, requiring surgery. In all, defendant had five or six gunshot wounds, according to the medical records. Defendant was treated with pain medication while at the hospital, including five doses of Fentanyl. Doctors gave defendant a dose of Fentanyl shortly after his arrival at 11:31 a.m. and then again at 11:52 a.m., 12:20 p.m., 12:50 p.m., and 1:10 p.m.

Detective Emanuel Miranda and two other officers from the Newark Police Department (Newark PD) Major Crimes Division arrived at University Hospital shortly after defendant in response to a report of a shooting victim's arrival at the hospital. Detective Miranda approached defendant, who was lying on a hospital bed in the Emergency Room's Trauma Section, and asked him where he was shot and how he got to University Hospital. Defendant told Detective Miranda that he was shot in Newark on Clinton Place, between Pomona and Goldsmith Avenues. Defendant further advised that he was driven to the hospital by Steffon Byrd in Byrd's vehicle. Detective Miranda interviewed the two passengers who accompanied defendant and Byrd to University Hospital -- Ja-ki Crawford and Daryl Cline -- but failed to develop any leads as to who shot defendant. Crawford told the officers that he, Byrd, and Cline happened upon defendant when they were returning from the laundromat and, seeing that he had been shot, took him to University Hospital.

4

At some point while medical professionals were tending to defendant, defendant's mother, father, and other family members arrived at the hospital. His mother testified at the evidentiary hearing that she was not allowed to see defendant and waited at the hospital for approximately two hours. Defendant was discharged at 2:30 p.m.

Upon discharge, instead of being allowed to go home with his family, defendant was advised by Newark Police officers that he had to report to the Newark PD. According to defendant's testimony at the evidentiary hearing, officers told him he had no choice in the matter. Officers escorted defendant -- who was walking with crutches -- from the hospital Trauma Section to a marked police car, put him in the back seat, and drove him to Newark PD's Major Crimes Unit. Defendant's mother testified at the evidentiary hearing that officers told her she could not take defendant home or drive him to the police station from the hospital. Defendant's parents followed the patrol car that was transporting their son to Newark PD. Officers further told defendant's mother that her son would be questioned about his injuries and how he got shot.

At Newark PD, defendant waited in a room with his father for several hours without speaking to any detectives or being told when he could go home. Eventually, Detective Rashaan Johnson of the Essex County Prosecutor's

5

Office (ECPO) briefly spoke with defendant and his father. Detective Johnson told defendant and his father to drive to the ECPO for further questioning. Defendant rode with his father to the ECPO, but they were escorted there by Detective Johnson and Detective Miranda Mathis.

Earlier in the day, Detective Johnson had been dispatched to investigate a homicide at Zakkiyah's Café (the Café) in Newark. When Detective Johnson arrived at the Café, he learned that a gunshot victim at University Hospital had reported being shot about four blocks away from the Café earlier that morning. Detective Johnson stayed at the Café with the ECPO's crime scene unit for several hours to examine the Café and the body of the store owner, Joseph Flagg, who had been shot and killed in an apparent robbery attempt. Police at the Café observed signs of a struggle, found several .45 caliber shell casings on the floor, and identified bullet holes in the Café's ceiling and in a window beneath the counter. Upon leaving the Café, Detective Johnson went to Newark PD, where he met defendant and his father and then escorted them to the ECPO for questioning.

At the ECPO, Detective Johnson placed defendant, who was not handcuffed, in an interview room apart from his parents, who were seated in a nearby conference room. Detective Johnson told defendant's parents that defendant needed to be interviewed because he was a victim of a shooting

potentially related to the shooting at the Café.  The interview room was small -- approximately four feet by four feet -- and contained an audio and video recording device, a table, and chairs for defendant, Detective Johnson, and Detective Mathis.  Defendant was told that the interview was being recorded. The detectives did not advise him of his <u>Miranda</u> rights.  According to Detective Johnson, he did not suspect defendant of killing Flagg or robbing the Café at that time.

The video recording of the statement depicts Detectives Johnson and Mathis interviewing defendant from 5:07 p.m. to 5:34 p.m. on October 27, 2013.  Detective Johnson began by stating that the ECPO was investigating a homicide that occurred at 282 Chancellor Avenue, Newark, New Jersey -- the location of Zakkiyah's Café where Flagg was killed.  Defendant responded to some preliminary questions in the beginning of the interview, confirmed that he was a minor, and provided his address and information about his parents. Defendant acknowledged that Detective Johnson spoke with his parents before the interview and that his parents gave permission for defendant to be interviewed.

Next, defendant narrated his version of the events of the day.  He said that he woke up at his brother's house that morning, a Sunday, and took the 107 bus back to his neighborhood which was a five- to seven-minute ride.

7

Defendant told the detectives he was wearing navy blue sweatpants, a white thermal shirt, and red and gray sneakers. He said that he got off the 107 bus and was walking on Clinton Place between Pomona and Goldsmith Avenues when he heard several gunshots and began running down Clinton Place, never looking back to see who was shooting. Defendant stated he then felt a tingling sensation and some pain and realized he had been shot. He said that when he reached the corner of Clinton Place and Hansbury Avenue, he flagged down Steffon Byrd and got into Byrd's pickup truck to go to the hospital. Byrd drove defendant to University Hospital along with two other men. Defendant told the detectives that he recognized the two other passengers but did not know their names. Later in the interview, Defendant said that one of the passengers was one of Byrd's relatives named "Woo." "Woo" is a nickname used for Daryl Cline. Defendant stated that he removed his shirt and pants on the ride to the hospital and left his clothing and phone in Byrd's truck.

Defendant then recounted his injuries and treatment to Detectives Johnson and Mathis. He explained that he did not call his parents when he headed to the hospital because he was afraid they would worry that he would die. Detective Mathis then asked defendant several questions about each part of his account of the day. Defendant told the detectives that he had no feuds with anyone that would explain the shooting. The detectives inspected

8

Ahmad's hands, which were partially bandaged from the gunshot wound and partially scratched. Defendant could not account for the scratches on his hands. The detectives also asked defendant about scratches they noticed on his neck, which defendant attributed to rough sex with his girlfriend.

The interview concluded after twenty-seven minutes. Defendant's mother testified that she asked for the interview to cease because she saw an officer enter the interview room holding what she believed to be a forensic kit. Defendant's mother, who had been waiting in another conference room, saw the officers photographing her son's hands as she approached the interview room. At that point, she asked for the interview to end. Defendant then went home with his parents.

Pursuant to the investigation into Flagg's murder, Detective Johnson retrieved from University Hospital the bullet that was surgically removed from defendant's ankle. Ballistics testing confirmed that the bullet removed from defendant's ankle matched shell casings recovered from the Café. Additionally, blood found at the Café matched blood swabbed from defendant's pants. According to Detective Johnson, it was at that point that defendant became a suspect in Flagg's murder. Detective Johnson also reviewed surveillance footage depicting the exterior of the Café. Around

11:00 a.m. on October 27, 2013, the video captured defendant, Ja-Ki Crawford, and Daryl Cline exiting the Café.

On November 4, 2013, Crawford gave a Mirandized statement to the ECPO incriminating defendant and Cline. In the videotaped statement, Crawford stated that he, defendant, and Cline were walking near Zakkiyah's Café when Cline said he was going to rob the business. Crawford claimed he felt threatened by Cline, so he complied by going into the Café and ordering food as Cline directed. Crawford said that defendant and Cline entered the store shortly after he did. Crawford stated that Flagg tackled defendant to the ground, which caused Cline to fire his gun into the fray, wounding defendant and killing Flagg. Crawford gave a similar account before the grand jury. Crawford reached an agreement with the ECPO pursuant to which he would cooperate against defendant and Cline and plead guilty to felony murder in exchange for being sentenced as a juvenile.

B.

An Essex County Grand Jury indicted defendant for second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and :15-1(a)(1); first-degree robbery, N.J.S.A. 2C:15-1(a)(1); first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); first-degree felony murder, N.J.S.A. 2C:11-3(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree

10

possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a).[2] Cline was indicted for the same offenses.

A pretrial evidentiary hearing was held to address the State's motion to admit defendant's October 27, 2013 videotaped statement at trial. The court heard testimony from Detective Johnson, defendant, and defendant's mother. Detective Johnson stated that on October 27, 2013, he was investigating Flagg's murder, but his assumption nevertheless "was that [defendant] was a victim of a violent crime." He explained, "[Defendant] was a victim -- he indicated that he was a victim of a crime -- a violent crime and in the vicinity we were investigating a murder. So, it possibly could be the same actors involved so we wanted to make sure." Detective Johnson also clarified that defendant's parents did not need to be in the interview room because defendant "was a witness at that time," but that Johnson nonetheless asked for their permission to interview him.

Defendant testified that he thought he was in custody when he was taken from University Hospital to the Newark police station and then to the ECPO:

> DEFENDANT: From the hospital, I thought I was going home, but the officer, he told me I had to go downtown for some questioning.

---

[2] The trial record reflects that defendant was waived to the Law Division and tried as an adult.

11

DEFENSE COUNSEL: Did he tell you why?

DEFENDANT: No, I told him I wanted to go with my mother and my family.

DEFENSE COUNSEL: And, he said?

DEFENDANT: He said, I had no choice.

DEFENSE COUNSEL: So, basically, did he tell you that you were not free to leave?

DEFENDANT: Yes. I thought I was under arrest because he put me in the back seat of the car, so --

DEFENSE COUNSEL: If you -- you weren't permitted to go with your parents?

DEFENDANT: No.

DEFENSE COUNSEL: You weren't permitted to go with anybody but the police officers?

DEFENDANT: No.

. . .

DEFENSE COUNSEL: And, while you were in that room and your father was there, were you free to leave?

DEFENDANT: No.

DEFENSE COUNSEL: How do you know?

12

DEFENDANT: Because I told my father I wanted to go -- I was in pain -- I was very agitated. I was 17 and I was shot at the time -- I wanted to go home. They told me I had to wait.

. . .

DEFENSE COUNSEL: You got to the Prosecutor's Office and you were -- what did they tell you when you got to the Prosecutor's Officer?

DEFENDANT: I recall Detective saying he wanted to question me about an incident that took place on Chancellor.

The court granted the State's motion to admit defendant's statement at trial, finding that Detective Johnson's testimony was credible and that defendant was interrogated as a shooting victim, not a suspect for Flagg's murder. The oral opinion highlighted that defendant's statement "was limited to the facts and circumstances surrounding his injuries without any questions or references of the shooting and/or death of Joseph Flagg. Nor did the defendant disclose any information or any involvement in the shooting of Mr. Flagg." Additionally, the court found that defendant never asked for a break or to stop the interview, never asked for an attorney or his parents to be present in the interrogation room, and answered all of the detectives' questions without hesitation.

In noting that <u>Miranda</u> requires an objective analysis "to establish whether or not a defendant was in custody based on the totality of the circumstances," the court held that defendant's statement was voluntary and "not the product of a custodial interrogation."  The court found that the factors indicating custody -- that defendant was questioned by detectives in an interview room at the ECPO, while being recorded, shortly after he had been shot, and without his parents present -- were outweighed by the factors indicating that the interrogation was not custodial:

> One, the defendant presented himself to officers as a victim of a shooting several blocks from where another man had just been murdered.  Two, the detective did not pressure the defendant, nor did their questioning appear to be pursued in order to obtain any incriminating statements.  The defendant was not linked to the homicide in question at the time of his questioning.  Objectively, defendant was not a suspect at the time of the questioning.  The detectives only later received [the ballistics] report and incriminating statements from others . . . connecting the defendant at the scene of the homicide.  Detectives did not ask the defendant any questions whatsoever pertaining to the murder of Joseph Flagg and restricted their questioning specifically to his injuries and/or the gunshots causing those injuries.
>
> . . .
>
> Furthermore, defendant did not confess to any crime.  Nor did he, from what I can read from the transcript, incriminate himself in any way in the shooting and/or the death of Mr. Flagg.  Instead, again as previously noted, the only questions asked of the defendant clearly

14

related to the wounds he received as a result of a shooting in the vicinity.

Finding that "the totality of the circumstances do not support the conclusion that the defendant was unduly restrained," the court ordered that defendant's October 27, 2013 videotaped statement be admitted into evidence.

Defendant went to trial, arguing that even if he had been shot in the Café, the State could not prove that he shot Flagg or that he conspired to rob the Café. Byrd testified that defendant was running down the street with Crawford and Cline when the trio asked Byrd to drive defendant to the hospital. Crawford testified at trial but recanted the version of events he gave in his statement to detectives and during his grand jury testimony. Crawford testified that he was at the Café on October 27, 2013 when an argument erupted between Cline and Flagg. Crawford testified that defendant, his close friend at the time, was trying to deescalate the argument when Flagg attacked defendant. After a brief tussle, Crawford heard several gunshots, ran out of the store, and realized that defendant was shot after defendant and Cline exited the Café. Crawford also read two letters he wrote to defendant's attorney to "help clear [defendant's] name." In one of the letters, Crawford claimed that defendant "did not know what was going on" and had been "in the wrong place at the wrong time." Crawford further stated in a letter that he "couldn't live with someone as smart and innocent as [defendant] doing time for something

15

he didn't do." The court admitted Crawford's previous statements inculpating defendant and played a recording of his November 4, 2013 interview with Detective Johnson for the jury.

The State played the video recording of defendant's October 27, 2013 statement, which was inconsistent with Crawford's and Byrd's testimonies. Defendant's recorded statement, during which he stated he was shot in the street, did not account for the physical evidence obtained at the Café -- specifically a blood sample taken from the scene that matched the blood on defendant's pants. Defendant did not testify.

The jury convicted defendant on all charges except first-degree murder, but found him guilty of the lesser-included reckless manslaughter charge. A different trial court judge sentenced defendant to the mandatory minimum thirty-year prison sentence with a thirty-year parole disqualifier for first-degree felony murder, in addition to a concurrent five-year sentence and forty-two-month parole disqualifier for second-degree unlawful possession of a weapon, while merging the other four counts into those two.

## C.

Defendant appealed, arguing that his October 27, 2013 statement should have been suppressed because he was in custody when he gave the statement and did not receive <u>Miranda</u> warnings. Defendant also argued that Detective

16

Johnson misrepresented his status as a victim to obtain permission from his parents to conduct the interrogation.[3]  In an unpublished opinion, the Appellate Division affirmed, deferring to the trial judge's "cogent application of the law to the facts he found" at the pretrial evidentiary hearing.  The appellate court agreed that defendant was questioned as "part of an investigatory procedure rather than a custodial interrogation" and that <u>Miranda</u> was therefore not implicated.  Additionally, the Appellate Division held that the trial court's factual findings "scotch defendant's claim that the police misrepresented his status as a victim to his parents in order to obtain their permission to question him."  That the ECPO detectives treated defendant as a victim was, according to the Appellate Division, supported by the fact that the detectives did not ask defendant about Flagg's murder and there was no information linking defendant to Flagg's murder until after the October 27, 2013 interview.

　　We granted defendant's petition for certification, "limited to the issue of whether defendant's statement was obtained in violation of <u>Miranda v.</u>

---

[3]  Although not presently before the Court in light of our limited grant of certification, defendant also argued that the trial court erred in instructing the jury that it could convict him for felony murder for being a mere co-conspirator to robbery, and that his conviction for reckless manslaughter should be vacated because the jury was not instructed on how to reconcile the purposeful state of mind required to impose accomplice liability with the reckless state of mind that is an element of manslaughter.  The Appellate Division rejected each of those arguments.

17

Arizona, 384 U.S. 436 (1966)." 241 N.J. 161 (2020). We also granted leave to participate as amici curiae to the American Civil Liberties Union of New Jersey (ACLU), the Association of Criminal Defense Lawyers of New Jersey (ACDL), the Northeast Juvenile Defender Center (NJDC), participating jointly, and to the Attorney General of New Jersey.

## II.

## A.

Defendant argues that the Appellate Division erred in affirming the denial of his motion to suppress his statement because he was in custody and was not advised of his Miranda rights prior to questioning. Defendant argues that objectively viewing the facts of this case, no reasonable 17-year-old in his position would have felt free to leave the Newark PD or ECPO. According to defendant, the Appellate Division reached its conclusion by erroneously focusing on the detectives' subjective belief that defendant was a victim, rather than applying the objective reasonable person standard to determine whether a reasonable person in defendant's position would have believed they were in custody. Defendant asserts that this violation of his constitutional right to remain silent required suppression of his statement. Because defendant was prejudiced by its admission, defendant maintains that his conviction must be reversed.

The ACLU, ACDL, and NJDC support defendant's position and argue that the trial court and the Appellate Division focused on the wrong standard in determining that defendant was not in custody at the time of questioning. Amici argue that the trial court and the Appellate Division should have engaged in the objective analysis of whether a reasonable person in defendant's position would have believed they were in custody. Amici further argue that defendant's status as a juvenile should have been taken into consideration in the analysis of whether he was in custody.

B.

The State argues that the Appellate Division properly affirmed the denial of defendant's motion to suppress his statement because the October 27, 2013 interview did not implicate Miranda. The State contends that defendant was not in custody at the time of the questioning because he was questioned as a victim and potential witness as part of the investigation into the homicide at the Café. The State argues that an objective view of the circumstances around defendant's statement indicates that a reasonable person in defendant's position would have felt free to leave. The State further asserts that even if the admission of defendant's statement was erroneous, the error was harmless and should not result in the reversal of his conviction.

19

The Attorney General, as amicus curiae, echoes the State's arguments and emphasizes that defendant was treated as a shooting victim and was free to leave at any time, so Miranda warnings were unnecessary. The Attorney General cautions against setting a precedent that would require police to give Miranda warnings to all victims before questioning them. The Attorney General asks the Court to affirm the Appellate Division decision and adhere to precedent requiring that Miranda warnings be given only to those who are considered suspects.

III.

A.

Our scope of review in this matter is limited. State v. Robinson, 200 N.J. 1, 15 (2009). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243 (2007) (quotation omitted). This Court gives deference to those findings in recognition of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Id. at 244. A trial court's legal conclusions, however, "and the consequences that flow from established facts," are reviewed de novo. State v. Hubbard, 222 N.J. 249, 263 (2015).

And, if the trial court does not make any factual finding on a given topic, no deference is due the conclusions it reaches on that subject. <u>See, e.g.</u>, <u>Hogan v. Gibson</u>, 197 F.3d 1297, 1306 (10th Cir. 1999) ("[B]ecause the Oklahoma Court of Criminal Appeals made no findings as to whether Hogan had presented sufficient evidence to warrant a first-degree manslaughter instruction, it is axiomatic that there are no findings to which we can give deference.").

B.

The Fifth Amendment of the United States Constitution, applicable to the States through the Fourteenth Amendment, <u>see</u> <u>State in Interest of A.A.</u>, 240 N.J. 341, 351 (2020), guarantees that no person "shall be compelled in any criminal case to be a witness against himself," <u>U.S. Const.</u> amend. V. This Court has reaffirmed time and time again that "[t]he privilege against self-incrimination . . . is one of the most important protections of the criminal law." <u>State v. Presha</u>, 163 N.J. 304, 312 (2000). Although not included in the New Jersey Constitution, the right against self-incrimination is deeply rooted in New Jersey common law and is codified in statutes and the Rules of Evidence. <u>See</u> N.J.S.A. 2A:84A-19; N.J.R.E. 503. Indeed, this Court has treated the state privilege against self-incrimination "as though it were of constitutional

21

magnitude, finding that it offers broader protection than its Fifth Amendment federal counterpart." State v. O'Neill, 193 N.J. 148, 176-77 (2007).

In Miranda v. Arizona, the United States Supreme Court held that individuals who are "subjected to police interrogation while in custody . . . or otherwise deprived of [their] freedom of action in any significant way" must be appropriately advised of certain rights so as to not offend the right against self-incrimination. 384 U.S. at 477-79. Miranda warnings, as they are now commonly referred to in the 55 years since that decision, include advising individuals of the right to remain silent, of the right to the presence of an attorney during any questioning, and that anything the individual says can be used against that person in a court of law. Id. at 479. Once advised of their Miranda rights, defendants may knowingly and intelligently waive those rights and make a statement or answer law enforcement's questions. Ibid. If Miranda warnings are "required but not given, the unwarned statements must be suppressed." Hubbard, 222 N.J. at 265.

Miranda is triggered only when a person is in custody and subject to questioning by law enforcement. State v. Wint, 236 N.J. 174, 193 (2018). This Court has "recognized that 'custody in the Miranda sense does not necessitate a formal arrest, "nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or

22

a public place other than a police station."""  State v. P.Z., 152 N.J. 86, 103 (1997) (quoting State v. Lutz, 165 N.J. Super. 278, 285 (App. Div. 1979)). Whether an individual is "in custody" for purposes of administering Miranda warnings is a fact-sensitive inquiry.  Hubbard, 222 N.J. at 266.

"The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." P.Z., 152 N.J. at 103.  The inquiry is an objective one, determined by "how a reasonable [person] in the suspect's position would have understood his situation."  Hubbard, 222 N.J. at 267 (alteration in original) (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  The inquiry is not based on "the subjective views harbored by either the interrogating officers or the person being questioned."  Ibid. (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).

Juveniles are afforded the same protections of the privilege against self-incrimination, so for a juvenile's statement to be admissible into evidence at trial, the statement must be made knowingly, intelligently, and voluntarily. State in Interest of A.S., 203 N.J. 131, 146 (2010).  "In determining whether a suspect's confession is the product of free will, courts" generally consider "the

totality of circumstances surrounding the arrest and interrogation, including such factors as 'the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'" Presha, 163 N.J. at 313 (quoting State v. Miller, 76 N.J. 392, 402 (1978)).

If a defendant's un-Mirandized statement is admitted into evidence in error, an appellate court will not reverse the conviction unless the error was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. Stated differently, "the error must be 'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.'" State v. Daniels, 182 N.J. 80, 95 (2004) (alteration in original) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

## IV.

Applying those principles to the facts of this case, we first consider whether defendant gave his unwarned statement while in police custody and whether the statement should therefore have been suppressed.

## A.

Our objective analysis focuses on what transpired at the hospital -- particularly the moment defendant was advised that he would be transported to

24

Newark PD for questioning and had no choice in the matter. The trial court made no factual findings regarding what occurred at the hospital and focused its analysis almost exclusively on what occurred during the interview, defendant's demeanor while answering questions, and the detectives' perspective that defendant was a victim at the time. Our analysis, however, ends at the moment defendant was placed in the back of a patrol car and transported to the Newark PD, having been told that he could not leave the hospital with his parents, because that is the moment at which we find that a reasonable 17-year-old would no longer have felt free to leave.

In the present case, on the day defendant gave his statement to police, he had just been shot multiple times. He was rushed to the hospital where he underwent surgery to remove a bullet from his ankle and was given five doses of the powerful narcotic Fentanyl. Upon being released from the hospital, this 17-year-old defendant was not allowed to go home with his family members, who were not permitted to be present when defendant was being treated. Instead, he was placed in the back of a Newark PD patrol car, crutches and all, and transported to the police station for questioning. At that moment, looking objectively at the totality of the circumstances, it is difficult to conceive that any reasonable 17-year-old in defendant's position would have felt free to leave; nor did any subsequent events do anything to lessen that impression.

25

It is undisputed that police transported defendant directly from University Hospital to Newark PD, where he waited with his father in a conference room for a couple of hours. Thereafter, defendant and his father were asked to travel to the ECPO for questioning. Defendant and his father drove together, but Detectives Johnson and Mathis escorted them to the ECPO where defendant provided a statement. By any objective measure, from the moment defendant left the hospital, he was in a continued state of law enforcement custody. A review of the facts surrounding defendant's statement leads us to only one conclusion -- that a reasonable 17-year-old in defendant's position would have understood that he was in custody. As a result, the detectives should have given defendant <u>Miranda</u> warnings prior to taking his statement.

The Appellate Division found that defendant was treated as a victim and was therefore not in custody. The State and the Attorney General's Office make the same argument. However, whether defendant was viewed as a victim by law enforcement at the time of questioning is not, and has never been, the relevant inquiry under <u>Miranda</u> for determining whether someone is in custody. That detectives believed defendant was a victim is of no moment because the inquiry is not based "on the subjective views harbored by either

26

the interrogating officers or the person being questioned." Hubbard, 222 N.J. at 267 (quoting Stansbury, 511 U.S. at 323).

Defendant was a minor, still in high school. He suffered the significant trauma of being shot multiple times. Immediately upon release from the hospital, he was placed in the back of a patrol car -- where arrestees are normally held -- and taken to the police station. We doubt there are many, if any, reasonable 17-year-olds who would think they were free to leave after such events. Accordingly, our decision today simply honors the long-held standard of whether a reasonable person in the defendant's position would have believed they were free to leave.

Based on the totality of those circumstances, we find that defendant was in custody at the time he provided his statement. And because defendant was not advised of his constitutional rights prior to giving his statement, the statement should have been suppressed.

B.

Having determined that the admission of defendant's statement at trial was error, we must now decide whether that error was harmful, that is, "clearly capable of producing an unjust result." R. 2:10-2. We conclude that it was.

At trial, Crawford testified that defendant was not involved in any plan to rob the Café. Crawford further testified that he and defendant were at the

27

Café when an argument erupted between Cline and Flagg, leading defendant to try to deescalate the situation. According to Crawford, defendant was shot while attempting to calm the argument. Crawford, the State's key witness, testified that his previous statements were false, and his trial testimony differed drastically from his grand jury testimony and his previous statements to police. He also sent two letters to defense counsel professing defendant's innocence.

Defendant did not testify, but defense counsel presented a defense in line with Crawford's trial testimony -- that defendant was simply in the wrong place at the wrong time. Defendant's statement to detectives, however, contradicted that version of events because defendant told police he was shot on the street as opposed to inside the Café. Defendant also told police that he did not know Crawford or Cline and that they were relatives of Byrd. Given that defendant's recorded statement contradicted Crawford's trial testimony and defendant's asserted defense, the statement was a damning piece of evidence that cast defendant as a liar. We cannot find that its admission was harmless.

The State argues that it presented overwhelming evidence of defendant's guilt "independent of defendant's statement." That evidence, as previously discussed, included contradictory and recanted statements from Crawford, who

28

testified at trial that defendant was innocent of the charges. It matters not, as the State suggests, that defendant's statement included exculpatory statements which "placed him several blocks away at the time of the shooting." Indeed, as the Supreme Court in <u>Miranda</u> aptly pointed out,

> If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.
>
> [384 U.S. at 477.]

Here, the State used defendant's recorded statement to demonstrate that defendant told untruths to detectives when he was questioned. In summation, the prosecutor argued that the statement was unbelievable, not supported by the evidence, and comprised of inconsistencies and falsities. The State unquestionably relied on defendant's recorded statement in attempting to convince the jury that defendant was guilty of the offenses charged, so its admission cannot possibly be viewed as harmless.

## V.

For those reasons, the judgment of the Appellate Division is reversed, and the matter is remanded for a new trial on the counts of conviction.

29

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion.