SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

## State v. Paul J. Caneiro (A-1-25) (091055)

**Argued November 3, 2025 -- Decided December 4, 2025**

**JUSTICE FASCIALE, writing for a unanimous Court.**

In this appeal, the Court considers whether the exigent circumstances exception to the warrant requirement was properly invoked during an active fire.

A fire was reported at defendant Paul J. Caneiro's home at around 5:02 a.m. in November 2018. About forty minutes after arriving at defendant's home, and while the house fire remained active, police seized, without a warrant, a security camera digital video recorder (DVR) located in the home's attached garage.

The State alleges that defendant murdered his brother, his brother's wife, and their two children, and then set their house ablaze to cover up his involvement in those crimes. The State further contends that defendant then set his own house on fire with his wife and children asleep inside as a ruse to suggest that criminals targeted both families. The State asserts that the DVR showed defendant disconnecting the security camera system prior to starting the fire in his house.

Defendant moved pre-trial to suppress the DVR. After a hearing, the trial judge granted defendant's motion. He determined that the warrantless seizure of the DVR was not justified by exigent circumstances because the garage fire "had been fully extinguished for nearly thirty minutes," and although the fire in the main house remained active, "the garage was located at the farthest possible point from the remaining fire." Considering the facts and circumstances, the trial judge concluded that the "deliberate approach taken to locate, retrieve, and seize the DVR, following the extinguishment of the garage fire and the establishment of scene control, was inconsistent with what an objectively reasonable officer would have done under the same circumstances." The Appellate Division affirmed the suppression order. The Court granted leave to appeal. 261 N.J. 586 (2025).

**HELD:** Under the totality of the circumstances in this case, the police acted in an objectively reasonable manner to meet an exigency that did not permit time to secure a warrant. No bright-line rule governs the question of exigency, and determining whether the exigency exception to the warrant requirement applies requires courts to

1

conduct an objective, fact-sensitive analysis. Drawing de novo legal conclusions from the facts found by the trial judge, the Court finds that here, time was of the essence, delay was not reasonable, and seizure of the DVR by the police without a warrant was justified by exigent circumstances.

1. Under both the United States and the New Jersey Constitutions, searches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid unless the State shows by a preponderance of evidence that the search falls within one of the well-recognized exceptions to the warrant requirement. Here, the State invoked the exigency exception. Exigency is found when circumstances preclude expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both. To determine whether exigent circumstances excused law enforcement officers from obtaining a warrant, the Court has provided a non-exhaustive list of factors that may be considered in analyzing whether law enforcement acted in an objectively reasonable manner to meet an exigency: "(1) the seriousness of the crime under investigation, (2) the urgency of the situation faced by the officers, (3) the time it would have taken to secure a warrant, (4) the threat that evidence would be destroyed or lost or people would be endangered unless immediate action was taken, (5) information that the suspect was armed and posed an imminent danger, and (6) the strength or weakness of the probable cause relating to the item to be searched or seized." State v. Manning, 240 N.J. 308, 333-34 (2020). (pp. 12-14)

2. The Court disagrees with the application of the Manning factors by the trial and appellate courts here. The parties do not dispute the seriousness of the crime under investigation -- aggravated arson. The first Manning factor weighs in the State's favor. Focusing on the attached garage, the trial judge concluded that the second Manning factor weighed against finding the seizure of the DVR to be justified by exigent circumstances. However, courts must consider all of the circumstances to determine whether the police had "an objectively reasonable basis to believe" that securing a warrant was not practicable because of "the urgency of the situation" they faced. An exigency analysis focuses on what officers knew at the time of making a warrantless seizure or entry. Here, when officers arrived at the scene, the house was "engulfed in flames." A sergeant whose testimony the trial judge found credible was worried because "the fire was near the gas meter," and "could have spread at any moment" or "accelerated and engulfed more of the house." Fire suppression activities involving water, chemical fire extinguishers, and power saws were ongoing and could have damaged the sensitive digital evidence in the DVR. The second Manning factor weighs heavily in the State's favor. (pp. 14-18)

3. As to the third Manning factor, the trial judge concluded that "[n]othing in the record indicates that delaying to obtain a warrant would have jeopardized the DVR

2

or compromised safety at the scene." Applying the undisputed facts, however, the Court concludes that it was objectively reasonable for police to believe there was insufficient time to secure a warrant. Officers understood how quickly the fire spread from the basement to the attic, creating a reasonable belief that if smoke or fire reached the garage again it would happen rapidly. It is difficult to predict the length of time it would have taken to obtain a search warrant, especially at 5:30 a.m. The third Manning factor weighs in the State's favor. As to the fourth Manning factor, the sergeant testified that the fire in the house remained active, and while the garage itself was no longer on fire, "the fire was near the gas meter." The sergeant's testimony also reflected that officers did not remove any evidence of potential arson that they were able to document on their body cameras -- they removed only the evidence that would be irretrievably destroyed if the fire spread. The fourth Manning factor weighs heavily in the State's favor. (pp. 18-21)

4. The fifth Manning factor weighs in defendant's favor: police at the scene had not yet identified defendant as a suspect in the alleged arson and were unaware of the earlier murders. The sixth Manning factor is "the strength or weakness of the probable cause relating to the item to be searched or seized." Officers found a burnt plastic gas can in the driveway that appeared to have been taken from another location on defendant's property. Police also found wet boot prints near the gas can storage area, burn marks on the hood of the car parked outside the garage door, and the smell of gasoline near the garage. Officers identified multiple ignition points -- indicative of arson. And the sergeant was aware from viewing defendant's security cameras in a prior, unrelated investigation that the cameras would likely show the cause of both the fire and the damage to the hood of defendant's car. The sixth Manning factor thus weighs in the State's favor. (pp. 21-22)

5. The Court explains why two cases on which defendant relies -- Michigan v. Tyler, 436 U.S. 499 (1978), and Michigan v. Clifford, 464 U.S. 287 (1984) -- are distinguishable from the present case. (pp. 22-26)

6. The Court does not impose any per se rules related to fires. The exigent circumstances exception cannot be defined with precision. Each case turns on its own unique facts, and application of the exigent circumstances exception demands an objective, fact-specific analysis. (p. 26)

**REVERSED and REMANDED for further proceedings.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, NORIEGA, and HOFFMAN join in JUSTICE FASCIALE's opinion.**

3

SUPREME COURT OF NEW JERSEY
A-1 September Term 2025
091055

State of New Jersey,

Plaintiff-Appellant,

v.

Paul J. Caneiro,

Defendant-Respondent.

On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| November 3, 2025 | December 4, 2025 |

Monica do Outeiro, Assistant Prosecutor, argued the cause for appellant (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Monica do Outeiro, of counsel and on the brief).

Monika Mastellone, Assistant Deputy Public Defender, argued the cause for respondent (Jennifer N. Sellitti, Public Defender, attorney; Tamar Lerer, Deputy Public Defender, and Monika Mastellone, of counsel and on the briefs).

Thomas M. Caroccia, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, Tim Sheehan, Assistant Attorney General, and Thomas M. Caroccia, of counsel and on the brief).

1

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Lowenstein Sandler, LLP, and American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom (Lowenstein Sandler), and Jeanne LoCicero and Ezra D. Rosenberg (American Civil Liberties Union of New Jersey Foundation), on the brief).

JUSTICE FASCIALE delivered the opinion of the Court.

In this interlocutory appeal, we must determine whether the exigent circumstances exception to the warrant requirement was properly invoked during an active fire. The issue before us is whether law enforcement officers had an objectively reasonable basis to believe that securing a search warrant was impracticable because immediate action was necessary to prevent the destruction of evidence located in a garage, not itself on fire, but attached to a house that remained ablaze.

About forty minutes after arriving at defendant Paul J. Caneiro's home, and while the house fire remained active, police seized, without a warrant, a security camera digital video recorder (DVR) located in the home's attached garage. Defendant later provided consent to search the DVR's contents. The parties do not dispute that defendant's consent to search the DVR was valid. They dispute only whether the warrantless seizure of the DVR was justified by the exigency exception to the warrant requirement. The trial judge, focusing

2

on the fact that the garage itself was not on fire, granted defendant's motion to suppress the DVR. The Appellate Division affirmed. We granted the State's motion for leave to appeal and have proceeded on an accelerated basis.

We hold, under the totality of the circumstances in this case, that the police acted in an objectively reasonable manner to meet an exigency that did not permit time to secure a warrant. We emphasize that no bright-line rule governs the question of exigency and that determining whether the exigency exception to the warrant requirement applies requires courts to conduct an objective, fact-sensitive analysis. Drawing our own de novo legal conclusions from the facts found by the trial judge, we find that here, time was of the essence, delay was not reasonable, and seizure of the DVR by the police without a warrant was justified by exigent circumstances.

We therefore reverse the order suppressing the DVR.

## I.

A grand jury indicted defendant and charged him with four counts of first-degree murder, two counts of first-degree felony murder, two counts of second-degree aggravated arson, and two counts of third-degree hindering apprehension or prosecution, as well as weapon possession and property offenses.

3

The State alleges that defendant murdered his brother, his brother's wife, and their two children, and then set their house ablaze to cover up his involvement in those crimes. The State further contends that, after the murders at his brother's home, defendant set his own house on fire with his wife and children asleep inside as a ruse to suggest that criminals targeted both families. The State asserts that the DVR, the subject of this interlocutory appeal, showed defendant disconnecting the security camera system prior to starting the fire in his house.

Defendant moved pre-trial to suppress the DVR. A hearing was held on the motion, during which the trial judge reviewed and considered evidence including body-worn camera footage, photographs, and various reports. Testimony was also taken from responding officers present at the scene of the fire.[1] The trial judge relied predominantly on testimony from Sergeant Jeffrey Malone and Officer David Marino. The court found that their testimony was "credible, forthright, and consistent with the record," and that the officers' actions "appeared to be well-intentioned and focused on the developing fire

---

[1] The judge heard the testimony of Monmouth County Deputy Fire Marshal Craig Flannigan, Sr.; Ocean Township Police Officers David Marino, Jr., Kevin Redmond, and Brendan Bernhard; Ocean Township Police Sergeants Christopher Brady and Jeffery Malone; and Monmouth County Prosecutor's Office Detective (now Captain) Brian Weisbrot.

investigation." The following facts were adduced at the multi-day suppression hearing.

A.

In November 2018, at approximately 5:02 a.m., Officer Marino, while on patrol, received an emergency call regarding "smoke in a residence." Marino arrived on scene within "three to four minutes" and observed that the "back corner of the house . . . was engulfed in flames." Other first responders were present at the scene and, when Marino arrived, defendant, his wife, and their two children were parked across the street from their two-story house. Across the length of the house, between thirty and sixty feet away from the location of the main house fire, officers observed a small fire in a garage attached to the house.

Sergeant Malone, who had been at police headquarters, overheard the emergency dispatch call. Malone determined the fire was "a more serious one," headed to the scene, and overheard officers on the radio stating the house was "fully engulfed" and that the house was "on fire near the gas meter." Malone arrived around 5:10 a.m., observed patrol cars and a fire vehicle, interacted with Officers Kevin Redmond and Charles Weinkofsky, and noticed firefighter Christopher Sorrentino at the scene.

5

Malone walked up the driveway toward the back of the house, where Weinkofsky had been standing, and saw that the house was "fully involved with the fire." Malone told Redmond and Weinkofsky to "get out of there" because "the area with the gas meter was on fire." Over the next five or six minutes, Malone directed them and other officers to "start evacuating the neighbors." By this time, other fire personnel started arriving at the scene and prepared to "put the fire out" by setting up the fire trucks and taking out water hoses. The fire, which had started in the basement, had reached the main roof and filled the house with smoke. Firefighters and ladder trucks from two fire departments arrived at the scene and undertook fire suppression efforts inside and outside the residence, including running fire hoses and utilizing power tools. The garage fire was quickly extinguished, but the house fire remained burning.

Malone and Redmond went to the attached garage area and saw the remnants of a small fire on one garage door, a red gas can with a melted nozzle, burn marks on two vehicles in the driveway, a charred rubber glove, and surveillance cameras on either side of the garage. Defendant had told the officers that gasoline cans were normally stored in an outdoor shed. Officers noticed a gap between the gasoline cans stored in the shed and saw wet boot

6

prints leading to and from the shed. Those factors led officers to suspect arson.

Malone notified Marino about what he and Redmond observed. Malone remembered that four years earlier, defendant had allowed him to view footage from those cameras to investigate a burglary on that street. Officer Brendan Bernhard approached defendant and his family and asked where the surveillance camera video was stored. Defendant's daughter stated it was in the garage, "up top to the left." Malone had police officers protect the garage area with crime scene tape and then looked for the fire marshal to alert him about the arson evidence. Malone learned that the fire marshal was inside the house, which was still ablaze. With active flames inside the house and visible smoke above the house, officers showed fire officials the arson evidence around the attached garage area.

Malone remained concerned about "suspicious circumstances surrounding the cause of the fire" and that the DVR was "going to be destroyed." Malone was worried that "the fire was near the gas meter," "could have accelerated and engulfed more of the house," and "could have spread at any moment." Defendant, too, was worried that a car parked inside of the garage could catch on fire and had returned to move his car out of the garage. At about 5:30 a.m., while firefighters continued to battle the main fire thirty to

sixty feet away, Malone directed Marino to remove the DVR from the garage. That occurred approximately twenty minutes after Malone arrived at the house.

At 5:37 a.m., about a half hour after the garage fire had been extinguished, Marino entered the garage and retrieved the DVR. The DVR was located atop a refrigerator against an interior wall abutting the main section of the burning house. Along the same interior wall, feet away from the refrigerator, was an interior door that connected the garage and the main section of the house.

Malone's body-worn camera documented the retrieval of the DVR and recorded the sound of saws from firefighters cutting holes in the roof of the home. Due to those fire suppression efforts, police had concerns about the structural integrity of the main house.

The DVR equipment was immediately placed in police custody and secured while fire suppression efforts continued elsewhere in the remainder of the house. Fire hoses still ran up into the house, a fire ladder had been extended over the roof, and firefighters continued to use power tools to vent the house. By this time, only about forty minutes had elapsed since the first police officers had arrived at the scene.

Malone testified that he did not have time to obtain a search warrant. According to Malone, the fire was ongoing in the basement and attic, there

8

were accelerants near the garage, the roof of the house was being vented, and fire suppression activities -- involving water, chemicals, and power saws -- were being carried out by the firefighters. Malone explained that there was not enough time to "contact [a] detective to have an affidavit written up and then contact an assistant prosecutor to review the affidavit and then get the search warrant or the affidavit before a judge."

B.

Following the hearing, the trial judge granted defendant's motion to suppress the DVR and rendered a comprehensive written opinion. He determined that the warrantless seizure of the DVR was not justified by exigent circumstances because the garage fire "had been fully extinguished for nearly thirty minutes," and although the fire in the main house remained active, "the garage was located at the farthest possible point from the remaining fire." Considering the facts and circumstances, the trial judge concluded that the "deliberate approach taken to locate, retrieve, and seize the DVR, following the extinguishment of the garage fire and the establishment of scene control, was inconsistent with what an objectively reasonable officer would have done under the same circumstances."

On leave to appeal, the Appellate Division affirmed the suppression order. The appellate court concluded that the trial judge's "factual findings are

9

fully supported by the motion record, warranting our deference." It also determined that upon a de novo review of the record, the judge's "legal determinations are unassailable."

After granting the State's motion for leave to appeal, 261 N.J. 586 (2025), we granted motions to appear as amici curiae filed by the American Civil Liberties Union of New Jersey (ACLU) and the Attorney General (AG).

## II.

The State takes no issue with the judge's credibility findings or factual findings, which are supported by body-worn camera footage. Instead, it argues that the trial judge and appellate court misapplied the undisputed facts to decades of law governing exigent circumstances, specifically in the fire suppression and investigation context. The State strongly advises against second-guessing the officers. It asserts that the actions of the responding officers were objectively reasonable and that the warrantless seizure of the DVR was justified by exigent circumstances.

The AG asserts that exigent circumstances justified the warrantless seizure of the DVR. The AG points to what the officers knew at the time of the seizure: active firefighting was underway near the gas meter; police feared the gas line could accelerate and spread the fire; smoke emanated from the roof; and accelerants were present in or near the garage, an area that had

10

already been on fire. The AG argues the trial court "mistakenly narrowed its focus to the garage" and overlooked that the garage was attached to the house where the fire was ongoing. The AG contends the officers' actions were objectively reasonable and properly based on the standard and factors outlined in State v. Manning, 240 N.J. 308 (2020).

Defendant contends the trial judge's factual findings are supported by the record and warrant deference on appeal. He maintains that police were without exigent circumstances and instead had to obtain a warrant to seize the DVR. Relying on Michigan v. Tyler, 436 U.S. 499 (1978), and Michigan v. Clifford, 464 U.S. 287 (1984), defendant argues that the police actions here required a warrant because they were directed at gathering criminal evidence rather than determining the fire's origin.

The ACLU argues that the exigent circumstances exception to the warrant requirement, under both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, mandates individualized consideration. The ACLU asserts that only three Manning factors are in dispute in this case and reframes those factors into a single question: whether the officers faced a sufficiently urgent situation in which evidence would have been destroyed during the time it would have

taken officers to secure a search warrant. The ACLU urges this Court to avoid imposing any per se rules related to fires.

### III.

When appellate courts review the grant or denial of a motion to suppress, they "must defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015). Only when factual findings "are clearly mistaken" can they be set aside. Ibid. "We accord no deference, however, to a trial court's interpretation of law, which we review de novo." State v. Dunbar, 229 N.J. 521, 538 (2017).

"The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in almost identical language, protect against unreasonable searches and seizures." State v. Smart, 253 N.J. 156, 164 (2023) (quoting State v. Nyema, 249 N.J. 509, 527 (2022)). "Under both constitutions, 'searches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid.'" Id. at 165 (quoting State v. Goldsmith, 251 N.J. 384, 398 (2022)). "[T]o overcome that presumption under both constitutions, the State must show by a preponderance of evidence that the search falls within one of the well-recognized exceptions to the warrant requirement." Ibid.

Here, the State invoked the exigency exception to the warrant requirement. Exigency is found when circumstances "preclude expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both." State v. DeLuca, 168 N.J. 626, 632 (2001) (quoting State v. Smith, 129 N.J. Super. 430, 435 (App. Div. 1974)). "Generally, when the State invokes the exigent-circumstances exception to justify a warrantless search, it must prove by a preponderance of the evidence that (1) the search was premised on probable cause and (2) law enforcement acted in an objectively reasonable manner to meet an exigency that did not permit time to secure a warrant." Manning, 240 N.J. at 333. The parties agree that the seizure of the DVR was premised on probable cause. We therefore focus on whether the police acted in an objectively reasonable manner to meet an exigency that did not permit time to secure a warrant.

The exigent circumstances exception cannot be defined with precision. Ibid. That is because "the unique facts of each case determine whether the need to act without delay is imperative." Ibid. Application of the doctrine of exigent circumstances therefore demands a fact-sensitive analysis. Ibid. Additionally, "there must be an objectively reasonable basis for the need for immediate action to justify forgoing the warrant requirement." Id. at 335.

To determine whether exigent circumstances excused law enforcement officers from obtaining a warrant, this Court provided, in <u>Manning</u>, the following non-exhaustive list of factors that may be considered in analyzing whether law enforcement acted in an objectively reasonable manner to meet an exigency:

> (1) the seriousness of the crime under investigation, (2) the urgency of the situation faced by the officers, (3) the time it would have taken to secure a warrant, (4) the threat that evidence would be destroyed or lost or people would be endangered unless immediate action was taken, (5) information that the suspect was armed and posed an imminent danger, and (6) the strength or weakness of the probable cause relating to the item to be searched or seized.
>
> [<u>Id.</u> at 333-34.]

IV.

In granting defendant's motion to suppress the DVR, the trial judge conducted a thorough hearing over multiple days and rendered a twenty-four-page written decision in which he made findings of fact and conclusions of law. The appellate court summarily affirmed "substantially" for the reasons stated by the trial judge. We respectfully disagree with the application of the <u>Manning</u> factors by the trial and appellate courts as well as their interpretation of the law, which we review de novo.

14

A.

1.

As to the first <u>Manning</u> factor, "the seriousness of the crime under investigation," the parties do not dispute the seriousness of the crime. Defendant was charged with second-degree aggravated arson, for which there is a presumption of incarceration if convicted that reflects "the gravity of the offense." <u>State v. O'Connor</u>, 105 N.J. 399, 405 (1987) (emphasis omitted) (quoting <u>State v. Roth</u>, 95 N.J. 334, 355 (1984)).

The first <u>Manning</u> factor weighs in the State's favor.

2.

The second <u>Manning</u> factor addresses "the urgency of the situation faced by the officers." The trial judge concluded that this factor weighed against finding the seizure of the DVR to be justified by exigent circumstances. The trial judge focused mostly on the attached garage, not the entire residence, and, in doing so, stated that the garage was "neither compromised nor actively threatened at the time of the DVR seizure." However, courts must consider all of the circumstances to determine whether the police had "an objectively reasonable basis to believe" that securing a warrant was not practicable because of "the urgency of the situation" they faced.

15

The trial judge found that the "main fire in the attic and southeast corner of the residence remained active." He concluded, however, that the "garage was not subject to exigent circumstances that would justify a warrantless entry and seizure" of the DVR. Focusing only on the garage, he found that the "small garage fire . . . had been fully extinguished for nearly thirty minutes"; "the garage had a roof independent of the second story attic"; the "garage's roof was structurally intact"; "[t]he garage was no longer an area of active firefighting, with a complete absence of visible smoke or flame in its vicinity"; "the garage was located at the farthest possible point from the remaining fire"; and the "officers engaged in calm, deliberate conversation" about the DVR's location. But relying mostly on those facts, years after the seizure, paints only a partial picture. Indeed, as the trial judge stated, "distinguishing among areas of a structure during an active fire response may seem overly technical or rigid." We disagree with the trial judge's legal conclusion that the specific facts of this case "compel such a distinction" between the attached garage and the main home.

An exigency analysis focuses on what officers knew at the time of making a warrantless seizure or entry. See State v. Hathaway, 222 N.J. 453, 469 (2015). Here, when officers arrived at the scene, the house was "engulfed in flames." Malone, whose testimony the trial judge found credible, was

16

worried because "the fire was near the gas meter," and "could have spread at any moment" or "accelerated and engulfed more of the house." A utility company employee shut off the gas moments before the seizure of the DVR, but Malone was unaware of that fact until after his officers seized the DVR. Fire suppression activities involving water, chemical fire extinguishers, and power saws were ongoing and could have damaged the sensitive digital evidence in the DVR. The garage was attached to the residence, which remained burning when police seized the DVR.

Moreover, the DVR was located on the inside garage wall -- the wall directly attached to the burning house. The DVR was less than sixty feet from the ongoing fire, which the firefighters continued to battle by using power tools to cut holes into the roof of the house. Police had concerns about the structural integrity of the house because the fire was in the attic and in the basement. Officers were aware that defendant returned to move his car out of the garage for fear it would catch on fire. Malone advised his officers to push back onlookers, and he commented about large lines (hoses) that firefighters were about to fill with water, indicating that he reasonably believed firefighters were about to pull hoses into the house and begin dousing the flames.

17

The trial judge relied heavily on the officers' calm demeanor during the fire emergency, noting the officers' "deliberate approach taken to locate, retrieve, and seize the DVR." But police are trained to remain calm in dangerous situations. And "the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 397 (1989).

Thus, the second Manning factor weighs heavily in the State's favor.

### 3.

As to the third Manning factor, "the time it would have taken to secure a warrant," the trial judge again relied on the "calm and deliberate manner in which [the] officers proceeded," found that the garage "had stabilized and was not under active suppression," and concluded that "[n]othing in the record indicates that delaying to obtain a warrant would have jeopardized the DVR or compromised safety at the scene." Applying the undisputed facts, however, we conclude that it was objectively reasonable for police to believe there was insufficient time to secure a warrant.

Malone testified that he did not have time to obtain a search warrant because the fire was ongoing in the basement and attic, accelerants were present near the garage, and fire suppression activities -- involving water, chemicals, and power saws to vent the roof of the house -- were being carried

18

out by the firefighters. Officers understood how quickly the fire spread from the basement to the attic and that smoke had filled defendant's bedroom. Defendant and his wife stated "the house was filled with smoke . . . I didn't even see the smoke at first . . . . My God it was so thick." This created a reasonable belief in the officers that if smoke or fire reached the garage again it would happen rapidly. Malone explained that there was not enough time to "contact [a] detective to have an affidavit written up and then contact an assistant prosecutor to review the affidavit and then get the search warrant or the affidavit before a judge."

It is difficult to predict the length of time it would have taken to obtain a search warrant, especially at 5:30 a.m. Generally speaking, obtaining telephonic search warrants can take anywhere between one to two hours. See State v. Witt, 223 N.J. 409, 441 (2015) ("[N]early three years after [State v. Pena-Flores, 198 N.J. 6 (2009)], the Burlington County project commissioned by the Administrative Office of the Courts found that the average time for obtaining a telephonic warrant was 59 minutes, and the State Police reported that Troop C experienced times of between 1.5 and 2 hours in the warrant-application process."). Thus, we conclude that it was objectively reasonable for officers to determine there was insufficient time to obtain a warrant while the fire in the main structure continued.

19

The third <u>Manning</u> factor weighs in the State's favor.

4.

As to the fourth <u>Manning</u> factor, "the threat that evidence would be destroyed or lost or people would be endangered unless immediate action was taken," the trial judge found that Malone's exigency determination was related to fires generally and not specific to this incident. But Malone's testimony reveals that his concerns were based on the limited information he knew about <u>this</u> fire.

Specifically, Malone testified that the fire in the house remained active, and while the garage itself was no longer on fire, he was concerned because "the fire was near the gas meter" and "could have accelerated and engulfed more of the house." It was due to this concern that Malone "directed the officers to get away from the house and to make evacuations." Malone did not know "when [the fire] was going to be out" and was "concerned that the evidence was going to be destroyed . . . . That [the DVR] was going to be burned off in the fire." Malone's testimony also reflected that officers did not remove any other evidence of potential arson because they were able to document that evidence on their body cameras -- they removed only the evidence that would be irretrievably destroyed if the fire spread.

20

Defendant argues that officers made a premature exigency determination because Malone (1) assumed that the smell of gasoline was dangerous when it could have been attributed to something else; (2) failed to ask firefighters if the garage was at risk of reigniting when he saw smoke; and (3) did not walk around the entire property before deciding that the circumstances were exigent. We disagree. The sergeant had to make decisions on the spot with limited information. An objectively reasonable police officer would interpret the smell of gasoline as indicative of accelerants still being present in and around the garage, posing a danger to the DVR. Even after the DVR was seized, the fire was still burning.

Therefore, the fourth <u>Manning</u> factor weighs heavily in the State's favor.

5.

As to the fifth <u>Manning</u> factor, "information that the suspect was armed and posed an imminent danger," police at the scene had not yet identified defendant as a suspect in the alleged arson. They were unaware of the murders of defendant's brother and his family immediately before the fire.

Thus, the fifth <u>Manning</u> factor weighs in defendant's favor.

6.

The sixth <u>Manning</u> factor is "the strength or weakness of the probable cause relating to the item to be searched or seized." Officers at the scene

21

found a burnt plastic gas can in the driveway that appeared to have been taken from another location on defendant's property. Police also found wet boot prints near the gas can storage area, burn marks on the hood of the car parked outside the garage door, and the smell of gasoline near the garage. Officers identified multiple ignition points -- indicative of arson. And Malone was aware from viewing defendant's security cameras in a prior, unrelated investigation that the viewing angles of the cameras would likely show the cause of both the fire and the damage to the hood of defendant's car. Based on those observations, there was a strong showing of probable cause.

The sixth <u>Manning</u> factor thus weighs in the State's favor.

\* \* \*

Given the totality of the circumstances in this case and based on all the facts found by the trial judge, we conclude that the State met its burden of demonstrating, by a preponderance of the evidence, that police here acted in an objectively reasonable manner to meet an exigency that did not permit time to secure a warrant.

### B.

Further, we find defendant's reliance on <u>Tyler</u> and <u>Clifford</u> misplaced. We note that we do not adopt a broad exception to the warrant requirement for

fire investigations; we discuss those cases only to show how they are distinguishable from and inapplicable to the instant case.

Tyler authorized officials to remain at the scene for a reasonable period after a fire has been extinguished to investigate the cause and origin of the fire without a warrant. 436 U.S. at 510. The Court held that "an entry to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze." Id. at 511. The Tyler Court rejected the "unrealistically narrow" view that "the need to get a warrant begins[] with the dousing of the last flame." Id. at 510. Instead, the Court recognized that "[p]rompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace," and that "[i]mmediate investigation may also be necessary to preserve evidence from intentional or accidental destruction." Ibid. The Court concluded that "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." Ibid.

But our case is distinguishable from Tyler. That case concerned the seizure, after a fire was extinguished, of evidence spotted in plain view during a warrantless entry made to fight a fire and investigate its cause. It involved an application of the exigent circumstances exception focused on the provision

23

of emergency aid and community caretaking. See id. at 509 ("[I]t would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze. And once in a building for this purpose, firefighters may seize evidence of arson that is in plain view.").

Here, the fire had not been extinguished -- the main fire in the house was still burning -- and entry into the garage was made to secure potential criminal evidence vulnerable to destruction by either the fire itself or the ongoing efforts to extinguish the blaze. This case does not involve an aid-driven application of the exigent circumstances exception, but rather a criminal investigatory application of the exception supported by probable cause and governed by the Manning factors and other principles discussed above. The Tyler test does not apply in this context just as the Manning factors would not govern a warrantless entry by firefighters combatting a blaze.

Clifford is similarly distinguishable from the present case. Procedurally, in Clifford, the prosecution did not "challenge the state court's finding that there were no exigent circumstances justifying the search of the . . . home"; it instead asked the United States Supreme Court to "exempt from the warrant requirement all administrative investigations into the cause and origin of a fire," which the Court "decline[d] to do." 464 U.S. at 291. Here, seizure of the DVR occurred less than forty minutes after officers arrived at a house that

24

was engulfed in flames, and the State, unlike in Clifford, has not asked us to address administrative investigations.

In Clifford, the Court reiterated that in Tyler it "upheld a warrantless post-fire search of a furniture store, despite the absence of exigent circumstances, on the ground that it was a continuation of a valid search begun immediately after the fire." Id. at 296. But the Court found that the Tyler rule did not apply to the facts of Clifford, which involved a post-fire search by arson investigators who arrived only after -- more than six hours after -- the fire had been extinguished, the firefighters had left the scene, and the homeowners had taken steps to secure the privacy of their house. Ibid. The Court stated that

> where a homeowner has made a reasonable effort to secure his fire-damaged home after the blaze has been extinguished and the fire and police units have left the scene, we hold that a subsequent post-fire search must be conducted pursuant to a warrant, consent, or the identification of some new exigency. So long as the primary purpose is to ascertain the cause of the fire, an administrative warrant will suffice.
>
> [Id. at 297 (footnote omitted).]

Unlike in Clifford, defendant here had not made efforts to secure his fire-damaged home after the blaze had been extinguished. Indeed, he could not have made such efforts because the blaze had not been extinguished -- the fire remained active, police were still on the scene, and firefighting efforts

25

were ongoing. Seizure of the DVR occurred during an ongoing fire, not hours after the fire had been extinguished and emergency personnel had departed, and not after defendant had taken any steps to secure his privacy interests against further intrusion.

In sum, neither Tyler nor Clifford compels a different result from the determination reached upon application of the Manning factors in this case.

We do not impose any per se rules related to fires. We reiterate that the exigent circumstances exception cannot be defined with precision. Each case turns on its own unique facts, and application of the exigent circumstances exception demands an objective, fact-specific analysis.

V.

We reverse the trial court order suppressing the DVR and remand for further proceedings.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, NORIEGA, and HOFFMAN join in JUSTICE FASCIALE's opinion.